**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 15, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GEORGE DAVID GORDON, a/k/a
"G. David Gordon"

Defendant-Appellant.

Nos. 10-5146 & 11-5009

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:09-CR-00013-JHP-1)

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant.

Claire McCusker Murray, Criminal Division, Appellate Section, U.S. Department
of Justice, Washington, D.C. (Thomas Scott Woodward, United States Attorney,
Catherine J. Depew, Assistant United States Attorney, Northern District of
Oklahoma; Kevin B. Muhlendorf and Andrew H. Warren, Trial Attorneys, Lanny
A. Breuer, Assistant Attorney General, Criminal Division, Greg D. Andres,
Acting Deputy Assistant Attorney General, Criminal Division, and Joseph Palmer,
Attorney, Criminal Division, Appellate Section, U.S. Department of Justice,
Washington, D.C., on the brief), for Plaintiff-Appellee.

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Defendant-Appellant George David Gordon is a former securities attorney

convicted of multiple criminal charges relating to his alleged participation in a

"pump-and-dump" scheme where he, along with others, violated the federal

securities laws by artificially inflating the value of various stocks, and then

turning around and selling them for a substantial profit.  The government also

restrained some of his property before the indictment was handed down and

ultimately obtained criminal forfeiture of that property.  We affirm Mr. Gordon's

conviction and sentence, as well as the accompanying forfeiture orders.

## I.  Factual and Procedural Background

Mr. Gordon was a securities attorney in Tulsa, Oklahoma.  The government

charged that Mr. Gordon and Richard Clark,[1] a Tulsa businessman, engaged in a

"pump-and-dump" scheme.[2]  As part of their scheme, Messrs. Gordon and Clark,

---

[1]      Mr. Clark is the subject of a related appeal arising from his convictions in the same scheme.  *See United States v. Clark*, No. 10-5152.

[2]      In the indictment, the government describes pump-and-dump schemes as follows:

> A pump and dump scheme involves the artificial manipulation of the price and volume of a particular stock in order to later sell that stock at an artificially inflated price.  Generally, the perpetrators of a pump and dump scheme obtain control over a substantial portion of free trading shares of the company.  Free trading shares are shares of stock that the owner can trade without restriction on a national exchange, e.g., the New York Stock Exchange or NASDAQ, or are traded in the over-the-counter market via the Pink Sheets.  To obtain the free trading shares, the perpetrators may orchestrate a reverse merger, which occurs when a privately held company with no publicly traded stock merges with a publicly listed shell company that has

(continued...)

along with other alleged co-conspirators, "acquired millions of shares in 'penny stock' companies[,] . . . used false and backdated documents to make their shares publicly tradeable[,] . . . [and] coordinated trading among themselves and nominees they controlled to create the false appearance of an active market for the stock[s]." Aplee. Br. at 3.

The government further claimed that the conspirators initiated false and misleading advertising campaigns to promote the stocks, sold the stocks through "an array of bank accounts and nominee[s]," and engaged in a subsequent cover-up to conceal their conduct from the Securities and Exchange Commission

---

[2](...continued)

> no assets or revenue but has stock available for public trading, resulting in a public company. The pump usually involves artificially inflating a company's stock price by engaging in coordinated trading of the stock in order to create the appearance of a more active market for that stock. The pump also usually involves disseminating false and misleading promotional materials—unsolicited advertisements touting a particular stock and encouraging others to purchase the stock, which are often sent to millions of recipients by fax or email "blasts." After pumping the stock, the perpetrators dump their shares, meaning they sell large volumes of the shares that they own and control to unsuspecting investors. The dumping often occurs soon after the dissemination of the promotional materials touting the particular company. The perpetrators of a pump and dump scheme will often "park" their shares by depositing or transferring them into different accounts, including nominees' accounts, and then trade the manipulated stock using the different accounts in order to conceal their trading activity.

R., Vol. I, at 55–56 (Indictment, filed Jan. 15, 2009).

("SEC"). *Id.* at 3–4.

The scheme can be traced back to 2004 when Mr. Gordon began dealing with Mark Lindberg and Joshua Lankford, two Dallas stock promoters (also alleged members of the conspiracy). Through a sequence of transactions, Mr. Gordon assisted Mr. Lindberg, Mr. Lankford, and others in, *inter alia*, establishing and promoting the stock of numerous companies. Transactions involving three companies headline the government's charges: specifically, National Storm Management ("National Storm"), Deep Rock Oil & Gas ("Deep Rock"), and Global Beverage Company ("Global Beverage"). The government also alleged that Mr. Gordon fraudulently obtained free-trading shares of International Power Group ("IPG"). We briefly discuss the material facts relevant to each company below.[3]

## A. National Storm

National Storm was a roofing and siding company in Illinois with annual revenues of around $8 million. Mr. Gordon and Mr. Lindberg met with National

---

[3] The entirety of the indictment charged Mr. Gordon with: conspiracy (Count 1), in violation of 18 U.S.C. § 371; wire fraud (Counts 2–10, 23), in violation of 18 U.S.C. §§ 1343 and 2(a); securities fraud (Counts 11–15), in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, 18 U.S.C. § 2(a); money laundering (Counts 16–21), in violation of 18 U.S.C. §§ 1957(a) and 2(a); making a false statement to a government official (Count 22), in violation of 18 U.S.C. § 1001; and knowingly corrupting, or attempting to corrupt, an official proceeding relating to the government's forfeiture attempts (Count 24), in violation of 18 U.S.C. § 1512(c)(2).

Storm's president in 2005 to discuss financing options. The parties agreed to take the company public. In pursuit of that goal, Mr. Gordon and an associate (New York businessman Richard Singer) arranged for a merger between National Storm and The 18th Letter—a public "shell company . . . that had been incorporated and had issued stock in 2002." Aplt. Opening Br. at 9.

Mr. Gordon forwarded to Mr. Singer a legal opinion letter pursuant to SEC Rule 144, signed by an associate attorney, Robert Bertsch, stating that The 18th Letter's shares were freely tradeable under Rule 144's criteria because the shares had been purchased by the respective owners two years ago. *See* 17 C.F.R. § 230.144(k) ("Rule 144") (2005) ("The requirements of paragraphs (c), (e), (f) and (h) of this section shall not apply to restricted securities sold . . . [by] a person who is not an affiliate of the issuer at the time of the sale . . . , provided a period of *at least two years* has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer." (emphasis added));[4] *see also M & A West*, 538 F.3d at 1051 ("Rule 144(k) permits a person who is not an affiliate of the issuer . . . to sell restricted securities without complying with certain requirements after they have held the securities for a period of two years." (footnote omitted)).

---

[4] "Rule 144(k) has since been repealed and replaced by Rule 144(b), which replaced the two-year holding period of Rule 144(k) with a one-year holding period." *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1046 n.1 (9th Cir. 2008).

Mr. Singer testified that because he was the only shareholder in The 18th Letter, Mr. Gordon instructed him to "offer some friends a thousand dollars each to falsely claim that they were shareholders." Aplee. Br. at 6. Mr. Gordon's office transmitted to Mr. Singer "backdated corporate records . . . that purported to memorialize Singers' [sic] friends' purchase of shares two years previously"—i.e., seemingly with the aim of satisfying Rule 144's requirements. *Id.*; *see* R., Vol. VIII, at 1494–98 (Trial Test. of Richard Singer, dated Apr. 14, 2010) ("[The documents] were backdated to show that the shareholders owned the stock longer than they actually did, so upon becoming a public company those shares would be freely tradable to sell in the market.").

The opinion letter was transmitted to a transfer agent so that the shares at issue could be traded publicly on an "over-the-counter" ("OTC") market. *See generally Black's Law Dictionary* 1214 (9th ed. 2009) (defining "over-the-counter market" as "[t]he market for securities that are not traded on an organized exchange"). The merged company consisted of six million freely-tradeable shares—or 15% of the total shares. National Storm's president held the remaining interest in the form of restricted shares (i.e., non-trading shares).

In 2005, several storms pelted the Gulf of Mexico, causing "severe damage" throughout the Southern states. Aplt. Opening Br. at 6. Because National Storm was a building company, Messrs. Gordon, Lindberg and Lankford wanted to take advantage of the potential for increased share performance, so they

-6-

employed a stock promoter named Dean Sheptycki (a charged co-conspirator) "who could write and send . . . millions of fax advertisements each day about a company." *Id.* at 10. A "fax blast" campaign was initiated subsequently; thousands of faxes were sent out touting strong market expectations for National Storm's future growth. A similar "e-mail blast" campaign followed.

The distributed material was misleading in many ways. For instance, an August 31, 2005, fax represented that "Wall Street expectations" for the company's growth were "207% now" and "450% in the next 12 months"—this, despite the fact that no Wall Street "analysts" were covering the company. Aplee. Br. at 7 (citation omitted) (internal quotation marks omitted); *see also* Aplt. Addendum, ex. 4 (Nat'l Storm Fax Advertisement, dated Aug. 31, 2005). Evidence also was introduced at trial that the faxes included misleading statements regarding the source of the information in order to "conceal the fact that the blast had been prepared by Sheptycki, reviewed by Gordon, and paid for from Gordon's client trust account." Aplee. Br. at 8; *see also* R., Vol. VIII, at 3049–50 (Trial Test. of Mark Lindberg, dated Apr. 6, 2010) (noting that a marketing company included in the fax blast disclosures actually had no involvement with their dissemination, and that a statement suggesting that non-affiliated shareholders paid for the advertisements was untrue). Similarly, one mass e-mail that contained information regarding National Storm's purported significant expected growth referred readers to the SEC's website for investor

information.  But, because National Storm was a so-called "Pink Sheet" OTC company, it was not required to file periodic reports with the SEC.  *See generally SEC v. Whittemore*, 659 F.3d 1, 5 (D.C. Cir. 2011) (describing the Pink Sheet system as "a trading system that lists small companies that do not meet the requirements of the major stock exchanges"); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1081 (9th Cir. 2010) (noting that the defendant's "stock has been traded on the Pink Sheets, now known as Pink Quote, an inter-dealer electronic quotation and trading system for registered and unregistered securities"); *Black's Law Dictionary* 1265 (defining "pink sheet" as "[a] daily publication listing over-the-counter stocks, their market-makers, and their prices"); R., Vol. I, at 53 (describing "Pink Sheets" as "a quotation service for over-the-counter stocks").

Throughout the advertising campaign, Mr. Gordon, along with other co-conspirators, including Mr. Lindberg, used various "nominee" accounts to disguise ownership of National Storm shares and coordinate trading.  National Storm's stock began to rise.  As the prices rose, the conspirators began selling their shares.  Ultimately, the conspirators made more than $5 million from the manipulation of National Storm.

## B.    Deep Rock

The conspirators conducted another promotion, this time of Deep Rock, a

Tulsa-based oil company. *See* Aplt. Opening Br. at 12 ("The rise in natural gas prices during the early part of 2005 caused Lindberg to want to do a similar promotion with Deep Rock . . . ."). Mr. Clark had held a majority of the "non-insider" shares of Deep Rock for many years. The government presented testimony that, similar to what had occurred with National Storm, Mr. Gordon arranged for Mr. Clark's shares to be transferred to various nominees in order to disguise their ownership. *See* R., Vol. VIII, at 3138–39 (noting that shares were "parked" with others in order "to not disclose who actually control[led] all the shares"). Mr. Gordon prepared an opinion letter stating that the nominees had fulfilled Rule 144's requirements in order for the stock to be assigned a symbol for public trading.

The conspirators began coordinated trading in Deep Rock stock, some of which occurred via separate nominee accounts. *See id.* at 3140 (discussing how the conspirators were able to "prime" Deep Rock stock—i.e., create the appearance of high-volume trading before promotions began). In September 2005, they sent out a series of fax and e-mail blasts hyping Deep Rock and touting its potential for astronomical profits in the wake of the chaos created by Hurricane Katrina and in light of rising energy prices. These faxes, like those in the National Storm blast, contained many misleading assertions. Also, in support of their efforts, the conspirators caused to be prepared certain promotional "magalogs"—i.e., catalogue-type brochures. Mr. Gordon personally reviewed

-9-

some of the promotional material. On one occasion, he responded on Deep Rock's behalf to a complaint about the fax blasts, denying knowledge of the source of the faxes, and noting that Deep Rock "would consider joining a lawsuit against the perpetrators." Aplee. Br. at 14.

Deep Rock's stock price rose. *See* Aplt. Opening Br. at 13 (noting that "[i]t spiked in September, 2005, then began a steady decline into 2006"). Mr. Gordon, along with his co-conspirators, made around $5 million in gross proceeds from Deep Rock sales.

## C. Global Beverage

In 2005, Mr. Lindberg and other co-conspirators became involved with a sport drink company (Rudy Beverages) founded by Rudy Ruettiger, a former Notre Dame athlete, and the subject of the major motion picture, *Rudy*. Mr. Ruettiger wanted to expand his business, and in the summer of 2005, conspirators, including Mr. Lindberg, put a plan into action to help finance the company. Global Beverages, a company in which certain conspirators controlled a substantial stake, acquired Rudy Beverages in the fall of 2005. While financing issues were worked out, Mr. Gordon permitted the conspirators to "park" millions of corporate shares in his client trust account.

Shares of Global Beverage became publicly tradeable. And Mr. Lindberg and other co-conspirators devised a plan to manipulate the stock. *See* R., Vol.

VIII, at 178 (Trial Test. of Mark Lindberg, dated Apr. 7, 2010) (noting that there was no difference between the "manipulation of Global Beverage . . . [and] National Storm and Deep Rock").[5] Mr. Lindberg testified that, as part of the plan, the conspirators placed many shares with nominees and began a promotional campaign for the company. Mr. Sheptycki composed and sent numerous faxes for the campaign. Further, e-mails and magalogs were transmitted. The promotional materials contained misleading information. *See id.* at 215 (noting that Mr. Sheptycki "made up" information regarding the source of the materials).

The price of Global Beverage stock spiked during the end of 2005 and beginning of 2006, but, due in part to disappointing financials, eventually dropped. The conspirators, including Mr. Gordon, made roughly $25 million total from the manipulation of Global Beverage.

## D. **International Power Group**[6]

Sometime in 2004 or 2005, Mr. Gordon approached Mr. Lindberg about getting a trading symbol for a private company that he and Mr. Singer had discovered: IPG. Mr. Gordon used a company called "Ednet"—an entity that was

---

[5] Mr. Lindberg advocated for a replacement of the CEO of the company. Mr. Gordon recommended Mr. Clark because he was "heat-resistant," *see* R., Vol. VIII, at 186, and would be "in with the plan," *id.* at 187. Mr. Clark became the CEO.

[6] The only substantive counts in the indictment that related to the IPG scheme (Counts 23 and 24) concerned charges that only implicated Mr. Gordon. *See* R., Vol. I, at 76–80; *see also* Discussion *infra*.

controlled by his "longtime friend and business associate," Mark White—to serve as a shell for a reverse merger with IPG. *Id.* at 251. *See generally M & A West*, 538 F.3d at 1046 ("A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering."). Mr. Gordon prepared a Rule 144 opinion letter and instructed Mr. Singer to have his attorney, Robert Bertsch, sign it on his firm's letterhead, "even though [Mr. Bertsch] had never communicated with the purported shareholders." Aplee. Br. at 13; *see* R., Vol. VIII, at 1604 (answering, "No. Not at all," to the question, "Did Mr. Bertsch have any conversations with any of [the shareholders]?"). Mr. Singer and Mr. Bertsch were given IPG shares.

Mr. Gordon advised Mr. Lindberg's assistant, Chasity Thompson, to prepare backdated corporate documents for Ednet, including bylaws and board meeting notes, because Mr. White ostensibly had "lost all the [original] documents." R., Vol. VIII, at 907–08 (Trial Test. of Chasity Thompson, dated Apr. 12, 2010). After the Rule 144 opinion that Mr. Gordon drafted was transmitted to a transfer agent, unrestricted shares were issued. Mr. Singer gradually sold shares on Mr. Gordon's behalf, and at one point in November 2005, wire-transferred roughly $1.7 million of the proceeds to "pay off the mortgage on [Mr. Gordon's] house." *Id.* at 1610. The government also presented evidence that Mr. Singer later prepared a false, backdated document purporting to

memorialize a sale of IPG stock between Mr. Gordon and Mr. Singer that never actually took place. This document allegedly was created in an attempt to stop the government from obtaining forfeiture of Mr. Gordon's home.

## E.    The Investigation and Prosecution

In 2004, SEC official Samuel Draddy began looking into an unrelated Pink Sheet company that had some "unusual trading surrounding its stock and appeared to be the subject of a promotional campaign." *Id.* at 1753 (Trial Test. of Samuel Draddy, dated Apr. 15, 2010). This case led to further investigations of other "similarly-situated issuers" with unusual trading patterns and promotional campaigns. *Id.* After taking a deeper look, investigators noticed that the companies under consideration revealed similar patterns where "the people involved owned shells, [which] were publicly-traded issuers that had no legitimate business purpose, . . . [and t]hey would then get private companies to reverse-merge into these shells so they could get publicly traded." *Id.* at 1754. Mr. Gordon represented some of the companies and individuals involved in the investigations, including National Storm and Deep Rock.

SEC investigators called Mr. Gordon on September 20, 2005. Before commencing the discussion, they informed Mr. Gordon that he could speak with counsel before answering their questions, and that he could choose whether or not to answer the questions as a general matter. They also informed him that "there

[were] potential penalties, both civil and criminal, for giving false answers to government officials." *Id.* at 1772. During the conversation, Mr. Gordon was asked about, and denied any knowledge of, the source of the National Storm and Deep Rock promotions.[7]

In 2007, roughly two years before the indictment was filed, the government placed a caveat on two lots that Mr. Gordon had previously acquired as a part owner of the Delvest Corporation (the "Delvest lots"). *See generally Black's Law Dictionary* 252 (defining "caveat" as "[a] warning or proviso"). Further, a caveat was placed on Mr. Gordon's personal residence. The government also seized two of his law firm's bank accounts. The government filed a civil forfeiture action against the residential property in 2007 and replaced the caveat with a *lis pendens*. Upon the response of Mr. Gordon's wife—who was listed as the primary owner of the home—the government obtained a stay pending the resolution of its criminal investigation. When the indictment was returned in 2009, it sought forfeiture of both the residence and the law firm accounts.

At trial,[8] the government called various witnesses (and co-conspirators) to

_____

[7] Later, on Mr. Gordon's recommendation, many of his individual clients involved in the transactions at issue invoked the Fifth Amendment and refused to testify in front of the SEC.

[8] On March 10, 2009, the district court granted the government's motion to declare the matter complex, and ordered an ends-of-justice continuance under the Speedy Trial Act. The court subsequently set the trial date for January

(continued...)

-14-

summarize the details of the conspiracy, including Mr. Lindberg and Mr. Singer. Investigator Draddy also testified about the promotional campaigns and Mr. Gordon's discussion with the SEC. Other witnesses were called to summarize volumes of documentary evidence.

Late in the trial, the district court excused a petit juror. Specifically, after the government rested its case, a juror informed a court staff member that she wanted to serve as an alternate because her continued presence on the jury "could affect the outcome of the case," R., Vol. VIII, at 2468 (Trial Tr., dated Apr. 29, 2010), because of, among other things, her "take on [certain] personalities," *id.* at 2478 (Trial Test. of Juror, dated Apr. 29, 2010). After an investigation, the court decided, over Mr. Gordon's objection, that it would excuse her "out of an abundance of caution." *Id.* at 2505.

Ultimately, Mr. Gordon was convicted on all counts that were submitted to the jury.[9]

---

[8](...continued)
19, 2010. However, the presiding judge recused himself in late 2009, and Judge James Payne was assigned to the matter. Judge Payne reset the trial date to March 29, 2010. However, in light of numerous pending motions and an interlocutory appeal filed by Mr. Gordon, the trial ultimately did not begin until April 5, 2010.

[9] Before the trial started, the government moved for, and the district court granted, dismissal of Count 16, a money laundering allegation.

**F.     Post-Trial Proceedings**

The U.S. Probation Office prepared a Presentence Report ("PSR"),

recommending various upward adjustments under the U.S. Sentencing Guidelines

("U.S.S.G.") for offense-specific characteristics.[10] The parties filed multiple

objections to the PSR. The PSR notably recommended a twenty-level

enhancement under U.S.S.G. § 2B1.1(b)(1)(K), because Mr. Gordon's fraudulent

conduct, both individually and jointly with others in the conspiracy, caused an

estimated loss to investors of, at the very least, an amount exceeding $7,000,000.

However, the PSR made explicit that *total* loss could not be accurately calculated,

and in that vein, set forth a potential alternative estimate of $10,720,000

representing Mr. Gordon's illicit *gain* from the stock scheme. Pertinently, the

government objected both to the PSR's calculation of loss, and to its alternative,

gain figure, arguing that—taking the most conservative approach—reasonable

estimations of loss (and alternatively, gain) far exceeded $20,000,000, which

would merit a greater enhancement.

Agreeing with the government, the district court determined that it would

be too difficult to determine the losses suffered by each individual investor.

Consequently, it calculated an illicit gain of $46,642,313 as an alternative

---

[10]     For its computations, the Probation Office used the 2009 edition of the U.S.S.G. Mr. Gordon has not taken exception to this choice. Therefore, we also reference that edition of the U.S.S.G.

measure of loss, resulting in a twenty-two-level increase in Mr. Gordon's offense

level under § 2B1.1(b)(1)(L) of the Guidelines. The court subsequently arrived at

a total offense level of forty-five and a criminal history category of I, which

produced a guideline range of life. However, the court granted Mr. Gordon's

request for a substantial downward variance and sentenced him to a total of 188

months' imprisonment.[11] The court further ordered Mr. Gordon to pay

$6,150,136.79 in restitution.

The district court also ordered forfeiture of, *inter alia*, up to $1.702 million

in equity in Mr. Gordon's home and the full amount in his law firm bank accounts

as directly forfeitable assets. The Delvest lots, along with some of Mr. Gordon's

other accounts and property, were later ordered forfeited as "substitute" assets.

*See generally* 21 U.S.C. § 853(p) (providing for the forfeiture of substitute

assets); *United States v. Bornfield*, 145 F.3d 1123, 1139 (10th Cir. 1998) ("An

asset cannot logically be both forfeitable and a substitute asset. . . . Assets

involved in or traceable to the offense are forfeitable once the requisite nexus is

established. The substitute assets provision allows the forfeiture of other assets

not already forfeitable when the forfeitable asset is unavailable due to some act or

---

[11]    The sentence consisted "of 188 months as to each of Counts Two
through Fifteen, and Twenty-three and Twenty four; 120 months as to each of
Counts Seventeen through Twenty-one; and sixty months as to each of Counts
One and Twenty-two, all counts to run concurrently." R., Vol. VI, at 1066 (J. in a
Criminal Case, filed Nov. 8, 2010).

omission of the defendant." (citation omitted)).  Mr. Gordon now appeals his conviction and sentence, and the district court's forfeiture orders.[12]

## II.  Discussion

On appeal, Mr. Gordon raises multiple issues relating to the validity of his conviction and sentence, and the propriety of the government's conduct (both before and after trial) related to the forfeiture of his assets.  In the end, we find no reversible error and affirm Mr. Gordon's conviction and sentence, as well as the district court's forfeiture orders.

## A.    Claims Relating to the Sixth Amendment Right to Counsel

Mr. Gordon first argues that the government improperly seized his assets and, as a consequence, substantially deprived him of his Sixth Amendment right to counsel.  However, we hold that, even assuming *arguendo* that the government acted improperly, Mr. Gordon's Sixth Amendment rights were not violated.

The Sixth Amendment provides that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI; *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire . . . .").

---

[12]    Because of the extensive nature of the facts in this case, we have offered *supra* only a general overview.  We supplement the overview with additional relevant facts in resolving Mr. Gordon's specific legal challenges.

-18-

"This protean right has several manifestations, some familiar, some less familiar." *United States v. Rosen*, 487 F. Supp. 2d 721, 726 (E.D. Va. 2007). Among these manifestations is the "*qualified* right to counsel of choice," which "stems from a defendant's right to decide what kind of defense he wishes to present." *United States v. Jones*, 160 F.3d 641, 646 (10th Cir. 1998) (emphasis added) (quoting *United States v. Collins*, 920 F.2d 619, 625 (10th Cir. 1990)) (internal quotation marks omitted). This right may not be "improperly impede[d]." *Id.* Indeed, the right to select counsel of one's choice "has been regarded as the root meaning of the constitutional guarantee." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006).

Practical considerations, such as a defendant's relative wealth or penury, can of course impose constraints on a defendant's ability to exercise his right to counsel of choice—that is, to hire the attorney that he prefers. A defendant's ability in this regard also may be limited by the claims of other parties to his resources. One such party may be the government. For instance, with regard to a defendant who is prosecuted by the government for certain crimes and convicted, "[t]he court . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1).[13]

---

[13] "The key to whether property is forfeitable is whether it is 'involved
(continued...)

In 2007, before Mr. Gordon was indicted, the government filed caveats on the Delvest lots, and a *lis pendens* and a caveat on his residential property; it also seized two of his law firm bank accounts.  In 2009, the government pursued forfeiture before the grand jury of the residence and the law office accounts.  As returned by the grand jury, the indictment did not mention the Delvest lots.  Furthermore, the grand jury found that the bank accounts were only *substitute*

---

[13](...continued)
in' or 'traceable to' the offense."  *Bornfield*, 145 F.3d at 1135 (quoting 18 U.S.C. § 982(a)(1)).  Property "involved in" the offense "include[s] the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and *any property used to facilitate the . . . offense*."  *Id.* (alteration in original) (quoting *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997)) (internal quotation marks omitted).  Further, "property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources."  *Id.*

In *Caplin & Drysdale*, the Supreme Court rejected any contention that "the Sixth Amendment puts limits on the forfeiture statute[s]."  491 U.S. at 625–26. Assets that are properly forfeitable are not the defendant's rightful property.  *See id.* at 626.  As ill-gotten gains, they are "another person's money."  *Id.*  Indeed, these assets may belong to the government by virtue of the "relation-back" provision of 21 U.S.C. § 853(c), which by operation of law vests title to forfeitable property in the government "upon the commission of the act giving rise to forfeiture."  *United States v. Jarvis*, 499 F.3d 1196, 1203 (10th Cir. 2007) (quoting 21 U.S.C. § 853(c)) (internal quotation marks omitted); *see United States v. Erpenbeck*, 682 F.3d 472, 477 (6th Cir. 2012) (noting, as to the relation-back doctrine, "[i]f the cash were tainted property, title would have vested in the government at the time of [the defendant's] fraud, which occurred prior to the bankruptcy filing, and the cash would not have entered the bankruptcy estate").  Based upon these principles, we have explained that "a criminal defendant has no Sixth Amendment right to use forfeitable assets to employ counsel."  *Jones*, 160 F.3d at 648.

assets—in other words, it determined that they were *not* directly forfeitable. The grand jury did find, however, that Mr. Gordon's residence was directly forfeitable, to the extent that it was connected to the IPG scheme. The government subsequently filed a Bill of Particulars that not only alleged that the residence was directly forfeitable, but also that the bank accounts were too, notwithstanding the grand jury's findings.

Mr. Gordon later filed a motion to dismiss on the grounds that the government's forfeiture conduct violated his constitutional rights, and the district court scheduled a hearing on the issue of forfeiture. However, the case was reassigned to a different judge, who struck all of the scheduling dates, and after ordering a surreply from the government, denied Mr. Gordon's motion to dismiss.

The gravamen of Mr. Gordon's claim is that the government wrongfully placed common law impediments on his property and thereby prevented him from accessing funds necessary to pay for his counsel of choice, in violation of the Sixth Amendment. As best as we can tell, his argument plays out as follows. First, some of the "restrained" property was not directly forfeitable; rather, it was "substitute" property that was off-limits to the government unless and until he is convicted, per our decision in *Jarvis*.[14] Second, even if his property was

---

[14] A defendant may own what the forfeiture statute calls "substitute property." *See* 21 U.S.C. § 853(p). Such property "neither comprises the fruits of nor is connected to the defendant's alleged crime." *Jarvis*, 499 F.3d at

(continued...)

-21-

forfeitable, the applicable provisions of the criminal forfeiture statute, 21 U.S.C.

§ 853, that authorize imposition of pre-indictment impediments on such property,

require that interested persons receive prior notice and an opportunity to be heard,

neither of which supposedly occurred here. These and other instances of

unfairness, he contends, infringed upon his Sixth Amendment right to counsel.[15]

---

[14](...continued)
1203–04; *see Bornfield*, 145 F.3d at 1139. "[F]orfeiture of substitute property cannot occur until after the defendant's conviction and a determination by the trial court that the defendant's act or omission resulted in the court's inability to reach [forfeitable property]." *Jarvis*, 499 F.3d at 1204; *see Erpenbeck*, 682 F.3d at 477 ("But the government did not seek forfeiture of the cash as tainted property. It argued (and the district court found) that the cash was 'substitute property'—untainted property that the government may seize to satisfy a forfeiture judgment *if* the tainted property is unavailable." (emphasis added)); *United States v. Oregon*, 671 F.3d 484, 487 (4th Cir. 2012) ("[W]hen the property representing direct proceeds of illegal activity is unavailable, the United States may instead seek the forfeiture of 'substitute property' of a defendant up to the value of the property that would otherwise be subject to forfeiture."). More specifically, in order for the government to forfeit substitute property, it must establish that through "any act or omission of the defendant" one of five things has occurred—for example, forfeitable property cannot be located through the exercise of due diligence, or such property has been placed beyond the jurisdiction of the court. 21 U.S.C. § 853(p)(1). Furthermore, we reasoned in *Jarvis* that because the government has no *pre-conviction* interest in substitute property, it may not impose pre-trial restraints on a defendant's substitute property. *See* 499 F.3d at 1204 ("[Unlike forfeitable property,] the United States does not have a ripened interest in § 853(p) substitute property until (1) after the defendant's conviction and (2) the court determines the defendant's . . . forfeitable property is out of the government's reach for a reason enumerated in § 853(p)(1)[].").

[15]     We interpret Mr. Gordon's briefs to make the alleged infringement of his Sixth Amendment rights the singular focus of his claims of prejudice; that is, the government's alleged circumvention of the procedural requirements for imposing pre-trial restraints on property was the means to effectuate his

(continued...)

The government's conduct, he reasons, was deliberately calculated to deny him the right of access to his funds to use for the presentation of a defense. *See, e.g.*, Oral Arg. at 0:58–1:12 ("The convictions in this case should be reversed . . . because Appellee orchestrated a calculated scheme to deprive [Mr. Gordon] of the use of his own funds to prepare a viable defense.").

At bottom, then, Mr. Gordon contends that, through its intentional and

---

[15](...continued)
unconstitutional injury. For example, he claims that the unlawful "seizure of his property . . . had profound implications under the Sixth Amendment for him to fund a viable defense." Aplt. Reply Br. at 13.

To the extent that there are arguments in Mr. Gordon's trial briefing that he has failed to press on appeal, we will not accord him the benefit of those arguments, despite his apparent request for a complete incorporation of his trial briefings, *see, e.g.*, Aplt. Opening Br. at 22 ("In this case, Appellee totally ignored the provisions of 18 U.S.C. [§] 853(e). . . . [I]t devised a scheme, every bit as complex as the criminal scheme alleged against [Mr. Gordon] in the indictment . . . . The actions taken by Appellee against [Mr. Gordon] are meticulously set out in trial counsel's proffer (XI-1), which should be considered by this court, along with trial counsel's motion to dismiss (X-1) and reply (X-351), in evaluating this appeal."). Litigants who premise their appellate arguments on the incorporation by reference of arguments that they have advanced in their trial court papers, or other materials, do so at their peril. It is beyond peradventure that such a briefing technique is disfavored. *See* 10th Cir. R. 28.4 ("Incorporating by reference portions of lower court . . . briefs or pleadings is disapproved and does not satisfy the requirements of Fed. R. App. P. 28(a) and (b)."). And we have repeatedly held that "[t]his court is under no obligation to consider arguments not fully set forth in a party's appellate brief, including arguments incorporated by reference to prior pleadings or other materials." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 979 n.14 (10th Cir. 2003); *accord Lauck v. Campbell Cnty.*, 627 F.3d 805, 814–15 (10th Cir. 2010). We follow this path here, declining to consider any arguments that Mr. Gordon purports to assert through incorporation by reference to his trial court papers or other materials.

-23-

wrongful circumvention of the proper procedures for imposing pretrial restraints or impediments on his property, the government violated his Sixth Amendment right to counsel of choice. In making this argument, Mr. Gordon heavily relies on *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006). Specifically, he reasons, that like *Stein*, this case involves a situation where the government's wrongful conduct resulted in a total deprivation of his right to counsel of choice. We disagree. Even assuming *arguendo* that the government acted improperly in imposing pretrial restraints on his property, Mr. Gordon cannot establish that this conduct violated his Sixth Amendment rights.

In particular, Mr. Gordon's attempt to establish a *Stein*-type violation is unavailing. In *Stein*, the court considered whether the government's actions in "interfer[ing] with the . . . Defendants' right to be represented as they choose, subject to the constraints imposed by the resources lawfully available to them," violated their Sixth Amendment right to counsel and the right to a fair trial. 435 F. Supp. 2d at 369; *see id.* at 360. The court concluded that the government's conduct in that case—which involved essentially convincing an employer to renege on prior legal-fee agreements with the defendants (its former employees)—violated the defendants' rights because, among other reasons, the government had directly interfered with resources that the defendants had a fundamental expectation could be used to fund their defense. *See id.* at 353 ("Absent the [the government's conduct], [the employer] would have paid the

-24-

legal fees and expenses of all of its partners and employees both prior to and after indictment, without regard to cost."); *id.* at 367–69.

On appeal, the Second Circuit affirmed the district court, concluding first that the district court properly considered "pre-indictment state action that affected defendants post-indictment," even though the Sixth Amendment right to counsel attaches "only upon indictment."[16] *United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008). More pertinently for this case, the Second Circuit agreed with the district court that the government's conduct violated the defendants' right to counsel, insofar as it directly "intrude[d] on the attorney-client relationship." *Id* at 154.

However, even if *Stein* provided an appropriate guidepost in certain cases of governmental interference with the right to counsel of choice, *Stein* is patently distinguishable from the instant case. First of all, the *Stein* defendants had demonstrably "limited resources" and had made a showing that their trial strategy was diminished significantly by the government's conduct. *See* 435 F. Supp. 2d

---

[16] The government here does not argue that Mr. Gordon's Sixth Amendment right to counsel was not affected *as a matter of law* by its pre-indictment conduct. *See generally Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008) ("The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" (footnote omitted) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991))). Consequently, we assume without deciding that the government's pre-indictment conduct could (as a matter of law) implicate Mr. Gordon's Sixth Amendment rights.

-25-

at 371–72. Even though Mr. Gordon's assets may have been incidentally constricted by the government's conduct, he has not demonstrated that he was denied access to funds to pay for his defense in any substantial sense; certainly, he has not demonstrated a magnitude of financial deprivation anywhere close to that experienced by the *Stein* defendants.

As the district court found in denying his motion to dismiss the indictment,

> [c]ontrary to Gordon's claims of financial hardship, he has paid defense counsel over $900,000 in attorneys' fees and costs since being indicted. Additionally, the government has submitted a loan application from November 2006, wherein Gordon stated his net worth was over $8.8 million ($8,816,000), including $2.8 million in a CD and $398,000 in cash. Thus, irrespective of his allegations that the Government's preservation of assets prevented him from hiring counsel of his choice, Gordon has not established he lacks funding to secure defense counsel.

R., Vol. X, at 504–05 (Dist. Ct. Order, filed as sealed Feb. 8, 2010) (citation omitted).

We agree with the district court that Mr. Gordon has not shown that he "ha[d] no assets, other than those restrained, with which to retain private counsel." *See Jones*, 160 F.3d at 647. Mr. Gordon does not meaningfully dispute that he *did* have other resources to fund his defense, only noting in conclusory fashion that "he did not" have such resources, Aplt. Reply Br. at 14, and that "the Sixth Amendment guarantees him the right to use the assets he has lawfully

available," *id.* at 14 n.3. This will not suffice.[17]

Furthermore, unlike *Stein*, it is quite significant that Mr. Gordon's counsel

remained fully and actively engaged in the case throughout the entire trial court

[17] More specifically, Mr. Gordon does not persuasively contest the district court's factual conclusions, claiming only that they were "based on an asset statement filled out . . . almost three and a half years earlier," and were contrary to the allegations in his counsel's motion to withdraw that "he had not been paid for over twenty months and was owed $73,000 for expenses already incurred." Aplt. Opening Br. at 27–28. Those assertions are unavailing, considering that our review of the district court's factual findings is for clear error. *See United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011) ("We also accept the district court's specific factual findings unless clearly erroneous—no easy hurdle to clear, requiring the defendant to show that the findings are more than possibly or even probably wrong but pellucidly so."); *United States v. Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) (analyzing the district court's factual findings for clear error in considering a motion to dismiss the indictment, and reasoning that a "factual finding is clearly erroneous when 'it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made'" (quoting *Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1266 (10th Cir. 2002))).

Here, Mr. Gordon "was represented by his counsel of choice through the end of trial," Aplee. Br. at 38, and the record clearly suggests that he had other available assets—including the equity in his home above the $1.7 million, which was the amount the government focused on in imposing the impediment on the Gordon residence—but did not elect to use those resources, *see id.*; R., Vol. X, at 281 (Letter from Steven A. Tyrrell to Thomas O. Gorman & William McGrath, dated Oct. 29, 2009) (setting forth the government's position that it was "amenable to any mortgage that would allow equity in [Mr. Gordon's home] over and above the amount of traceable proceeds to be used for attorney fees"). Mr. Gordon claims that the government's offer to make additional equity in his residence available for funding was essentially hollow in light of the fact that it asserted "open-ended claims" against his property, making it unlikely that a lender would provide a mortgage. *See* Aplt. Reply Br. at 4 n.1. But he provides no explanation for why this would necessarily be the case if the government's interest—if any—in the property was only (at most) $1.7 million.

-27-

proceedings.[18]  Indeed, our searching review of the record demonstrates that Mr.

Gordon was represented in a thorough and vigorous fashion by the attorney he

originally retained.  Mr. Gordon's allegations of prejudice come down to

statements in which he suggests that "[p]reparing the defense to this action would

require a team of experienced white collar and securities lawyers" who would

have to sort through the thousands of documents prepared during the

investigation—i.e., documents in his own war room.  *Id.* at 16 (citation omitted)

(internal quotation marks omitted).  However, Mr. Gordon does not identify any

concrete facts that would explain what was actually done in preparation for his

defense and what additional steps his counsel would have taken, if Mr. Gordon

had not been denied access to his funds through the government's allegedly

wrongful conduct.

In light of the district court's findings regarding Mr. Gordon's access to

considerable financial resources to pay his counsel, we will not engage in

speculative ping-pong about the potential for harm to his defense resulting from

the government-initiated restraints on his property—even assuming that those

---

[18]    Indeed, the Second Circuit in *Stein* made it explicit that this situation of ongoing representation by counsel of choice was beyond the scope of the issues in that case.  *See* 541 F.3d at 158 n.15 (refusing to address the application of its own holding to a scenario where "[t]he defendant proceeds to trial with his or her chosen attorney, and the attorney is forced to limit the scope of his or her efforts due to the defendant's financial constraints" and "[t]he defendant is convicted based on overwhelming evidence of his or her guilt").

restrains were improperly imposed.[19]  *See United States v. Dowie*, 411 F. App'x

---

[19]    Our tacit proposition that Mr. Gordon must establish prejudice to prove a violation of his Sixth Amendment rights may warrant further explication. In *Gonzalez-Lopez*, the Supreme Court concluded, "[w]here the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."  548 U.S. at 148.  The right is "wrongly denied" where the "defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."  *Id.*  However, acknowledging that "most constitutional errors" do not affect the "structural" nature of the proceedings, *see id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)) (internal quotation marks omitted), a number of courts have applied a "prejudice" inquiry when addressing allegations of improper *interference* with a defendant's Sixth Amendment right to counsel, *see, e.g.*, *Rosen*, 487 F. Supp. 2d at 735; *United States v. Olis*, Nos. H-07-3295 & H-03-217-01, 2008 WL 5046342, at *12 (S.D. Tex. Nov. 21, 2008)—as opposed to allegations of a *complete denial* of that right.  Notably, in such cases, unlike in *Gonzalez-Lopez* and *Stein*, "defense counsel . . . remain[s] fully engaged in th[e] case" and the allegation of interference really centers on its "adverse effect on [counsel's] ability to mount a defense by reducing the resources available," *Rosen* 487 F. Supp. 2d at 734.

This approach has merit.  Where the right to counsel of choice is not fully denied, but rather the situation is that counsel's representation may have been constrained or limited by some external governmental factor (as is alleged here), the crux of the defendant's claim is really that he has been denied the right to constitutionally effective representation.  *Cf. Gonzalez-Lopez*, 548 U.S. at 148 (warning against "confus[ing] the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed").  Ordinarily, a defendant cannot establish a Sixth Amendment violation based upon deficient performance "until the defendant is prejudiced."  *Id.* at 147; *see United States v. Gaya*, 647 F.3d 634, 638–39 (7th Cir. 2011) ("The defendant who has a lawyer, even an incompetent one, must to establish a violation of his constitutional right to effective assistance of counsel prove that he was prejudiced by the lawyer's incompetence . . . .");  *United States v. Lewis* (*Beau Lee Lewis*), 611 F.3d 1172, 1177 (9th Cir. 2010) ("Defendant fails to identify any actual prejudice that occurred as a result of being represented by other counsel, who mounted a highly competent and

(continued...)

-29-

21, 29 (9th Cir. 2010) (refusing to credit a *Stein*-type argument where the defendant failed to rebut the district court's findings that he "maintained his counsel of choice throughout the trial, and there was no indication their defense work was limited in any way"); *see also Rosen*, 487 F. Supp. 2d at 735–36 (finding that defendants' *Stein*-type argument was "not persuasive" where "the record . . . reflect[ed] that defense counsel . . . mounted a vigorous and effective defense notwithstanding the absence of [advances of attorney fees that were allegedly stanched by the government's wrongful interference]"); *Olis*, 2008 WL 5046342, at *13 ("[The defendant] has failed to present any evidence showing either that he lacked funds needed to mount the defense of his choosing or that the defense presented at his trial was anything other than the defense he chose to present and would have presented [absent interference]."). In sum, we conclude that Mr. Gordon has not established a deprivation of his Sixth Amendment right to counsel of choice.

## B.    Sufficiency of the Evidence

Mr. Gordon challenges the sufficiency of the evidence as to all of the substantive counts relating to the scheme to defraud with respect to the

---

[19](...continued)
vigorous defense."); *cf. United States v. Morrison*, 449 U.S. 361, 365 (1981) ("The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact . . . there is no basis for imposing a remedy in that proceeding . . . .").

promotional campaigns for National Storm, Deep Rock, and Global Beverage. In addition, he challenges the counts that are predicated on the allegedly fraudulent nature of the opinion letters permitting restriction-free designations on some of the stocks at issue—specifically, the stock of National Storm, Deep Rock, and IPG. Finally, he claims that the evidence is insufficient to show that he obstructed, or attempted to obstruct, an official proceeding.

"In reviewing the sufficiency of the evidence and denial of a motion for judgment of acquittal, this court reviews the record *de novo* to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Irvin*, 682 F.3d 1254, 1266 (10th Cir. 2012). In conducting this inquiry, the court may "not 'weigh conflicting evidence.'" *Id.* (quoting *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003)). Moreover, the "court considers the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it." *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008).

### 1.    *The scheme to defraud*

Mr. Gordon makes various arguments that challenge the sufficiency of the government's evidence regarding the counts associated with the charged scheme to defraud. First, without identifying the specific legal shortcomings of any

particular count, he makes a global argument that "the fax blasts, e-mails and the brochures were [not] illegal," Aplt. Opening Br. at 33, for the National Storm, Deep Rock and Global Beverage promotions under § 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b), "which makes it unlawful to publicize a stock for consideration from an issuer, underwriter, or dealer without disclosing the fact and amount of the payment," *United States v. Wenger*, 427 F.3d 840, 843 (10th Cir. 2005). Citing our articulation of § 17(b)'s requirements in *Wenger*, *see id.* at 852, Mr. Gordon contends that the faxes, e-mails, magalogs, etc., in this case required only a disclosure that the promoter received payment for the advertisement, and disclosure of the amount of the payment. He submits that all of the promotional material at issue contained such information and, contrary to the government's arguments, it did not need to include the "name" of the promoters or whether the promoter was buying or selling the stock. *See* Aplt. Opening Br. at 31 (discussing evidence showing that "Pink Sheets wanted the SEC to include more requirements in such advertisements, such as identification of the promoters," but as of the time of Mr. Gordon's criminal conduct, no such requirements existed).

However, as the government correctly notes, Mr. Gordon was not charged with violating § 17(b). Instead, as relevant here, he was charged under the general wire fraud statute, *see* 18 U.S.C. § 1343, and § 10b of the Securities Act of 1934, and the applicable rule promulgated thereunder, 17 C.F.R. § 240.10b-5

("Rule 10b-5"), for "unlawful[ly] . . . employ[ing], in connection with the purchase or sale of any security . . . [a] manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b). Mr. Gordon has failed to explain how technical compliance with § 17(b) would provide an effective safe harbor or immunity from prosecution for the manipulation of stock with the intent to defraud investors, which ordinarily would give rise to violations of the wire fraud statute and Rule 10b-5. *Cf. Wenger*, 427 F.3d at 852–54 (analyzing separate charges arising out of the same fraudulent scheme under § 17(b) *and* § 10(b), because "the government presented sufficient evidence to convince a reasonable jury beyond a reasonable doubt that [the defendant] had intent to defraud"). In other words, he offers no legal support for his global argument on appeal; consequently, we reject it.

Even so, Mr. Gordon contends that with respect to the allegations *related to Rule 10b-5*, there can be "no liability . . . for failure to disclose information absent a duty to do so." Aplt. Opening Br. at 32. Thus, as Mr. Gordon reasons, to the extent that the government's allegations concern the non-disclosure of certain information in the promotional materials such as, for instance, the true identity of the source of the material—*viz.*, the members of the underlying conspiracy—they are legally insufficient because there was no *independent duty* to disclose such information in this case, either by him or his co-conspirators. In essence, Mr. Gordon challenges whether the government showed, beyond a reasonable doubt, that there were actionable misstatements or omissions, as well

-33-

as a fraudulent intent to deceive investors.[20]

In support of this assertion, Mr. Gordon cites *United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010), a Third Circuit case that affirmed the dismissal of multiple Rule 10b-5 charges upon the theory that a corporate executive had an affirmative fiduciary duty to correct material misstatements made by another executive.  In concluding that the government's theory was too broad, the court in *Schiff* pointed out that § 10b gives rise to a duty to disclose in three separate and distinct circumstances: (1) where there is insider trading, (2) where a statute requires disclosure, or (3) where there has been an "inaccurate, incomplete or misleading prior disclosure."  602 F.3d at 162 (quoting *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000)) (internal quotation marks omitted).

However, despite the holding in *Schiff*, "where a party without a duty *elects*

---

[20]    "Violations of section 10(b) and Rule 10b-5 can give rise to both civil liability and criminal liability."  *United States v. Laurienti*, 611 F.3d 530, 537 (9th Cir. 2010) (citing *Chiarella v. United States*, 445 U.S. 222 (1980)).  The basic elements for a Rule 10b-5 charge based upon misstatements or omissions in a civil context include the requirement that the government prove that the defendant "(1) made a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means."  *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008); *accord SEC v. Curshen*, 372 F. App'x 872, 877 (10th Cir. 2010); *cf. Wenger*, 427 F.3d at 854 ("Fraudulent intent is an element of a Section 10(b) offense.").  The jury instructions on the 10b-5 allegations in this case were stated in a manner that was generally consistent with the foregoing requirements. *See* R., Vol. VIII, at 2544–45 (Jury Instructions, given Apr. 29, 2010).  The primary distinction between 10b-5 actions in the civil and criminal context is that in the latter the "government must prove the offense beyond a reasonable doubt." *United States v. Gansman*, 657 F.3d 85, 91 n.7 (2d Cir. 2011).

*to disclose material facts*, he must speak fully and truthfully, and provide complete and non-misleading information." *Curshen*, 372 F. App'x at 880 (emphasis added); *see also Schiff*, 602 F.3d at 162 ("When you speak, however, and it is material, you are 'bound to speak truthfully.'" (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992))); Thomas Lee Hazen, *The Law of Securities Regulation* § 12.9[10], at 471–72 (6th ed. 2009) ("[O]nce a statement of fact . . . has been made, the person making the statement is then under a duty to correct any misstatements . . . .").

In this case, the government offered substantial evidence that many aspects of the information disseminated in the promotional campaigns were false and misleading, and that misleading statements went uncorrected by numerous material omissions. *See, e.g.*, R., Vol. VIII, at 3045–46 (noting that, despite an advertisement representing that "Wall Street expectations" were good for National Storm, the statement was incorrect and was made "to make it appear as though Wall Street was covering it and that the stock was going to rise because of it"); *id.* at 3049–50 (noting a fax blast's assertion that "Putnam International Consulting," was the source of payment for a particular fax blast, was false because the blast "was paid for out of . . . Gordon's attorney trust account [by him and other members of the conspiracy]" and they "had control over more than 10 percent of the company making [them] affiliates"); *id.* at 3085 (discussing language in one of the e-mail blasts encouraging investors to refer to the SEC's

-35-

website for information seemingly related to National Storm, when certain conspirators knew that the company was, in fact, not registered with the SEC in light of its Pink Sheet status); *id.* at 3145–48 (describing a similarly misleading fax blast campaign with respect to Deep Rock, and noting that a statement representing that non-affiliated shareholders paid the fee for advertisements was false because, *inter alia*, Mr. Gordon "controlled the float"); *id.* at 214–15 (noting that, like in prior blasts, Mr. Sheptycki "made up" information on the identity of the source of a Global Beverage blast and projected growth numbers).

Significantly, the evidence also tended to establish that there was a group of shareholders (of which Mr. Gordon was a part) who disguised their stake in the applicable stocks by using nominee accounts, and who fraudulently manipulated the price in order to make a profit, all at the expense of the general shareholders.[21]

_____

[21] Mr. Gordon contends in passing that many of the "falsehoods" and instances of alleged misconduct simply were not actionable for various reasons. Most of his arguments are easily disposed of. For instance, he claims that, on cross-examination, Mr. Lindberg "admitted" the statements in the faxes and e-mails were correct, but Mr. Gordon does not explain *which* statements were "correct," and his argument contradicts Mr. Lindberg's long direct testimony. In addition, he argues that the information in some of the faxes was mere puffing. To be sure, generally, loose "statements of optimism are not actionable." Hazen, *supra*, § 12.9[4], at 464; *see id.* at 464 nn.123, 128 & 130 (citing cases). However, "[m]isrepresentation by implying the existence of certain facts cannot be disguised as mere puffing." *Id.* at 464. The statements identified by the government in the evidence are not "generalized [ones] of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). To the contrary, at the very least, those statements falsely imply that objective sources had predicted the stocks to skyrocket, and omit crucial

(continued...)

*See, e.g.*, *id.* at 3139–40 (noting that the "plan" as to Deep Rock "was to start the stock at four or five cents and gradually walk it up before the promotional effort started" and that the priming was "substantially . . . controlled").

On this record, we conclude that any rational trier of fact could have found that Mr. Gordon's conduct was fraudulent within the meaning of the securities laws. *See, e.g.*, *United States v. Ware*, 577 F.3d 442, 448 (2d Cir. 2009) (concluding that the evidence was sufficient to convict the defendant of securities fraud in a "pump-and-dump" scheme where he sent out press releases—regarding a company in which he owned millions of shares—that "fabricated . . . [the] sources of [the] factual information" in the press releases and failed to disclose the true sources of the funds allowing for release of the press releases); *Wenger*,

---

[21](...continued)
information about "who" was really paying for the promotions. Inasmuch as a "reasonable investor would place [significance] on the withheld or misrepresented information," *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988), any rational trier of fact could have found Mr. Gordon guilty.

He also makes a general contention that the use of nominee accounts was not illegal, and it was not improper to engage in "[t]imed sequences of buying and selling" in the stocks at issue. Aplt. Reply Br. at 19 (discussing evidence that suggested Pink Sheet stocks are often made up of a small group of investors). However, even assuming that the buying and selling of stock by a small group of individuals is not per se illegal, Mr. Gordon does not explain how it necessarily follows that the same is true *where the transactional purpose* is to create the false appearance of an active market for the shares in order to induce people to rely on that impression and buy the stock. And the testimony at trial tended to establish that these were the reasons for many of the conspirators' nominee accounts, promotional campaigns, and the transaction sequences. *See, e.g.*, R., Vol. VIII, at 3140–42 (suggesting as much with respect to Deep Rock).

427 F.3d at 854 (holding that there was sufficient evidence of fraud under § 10b, where the defendant sent out newsletters advising investors to buy a stock, which "at the same time" he was selling); *cf. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008) ("[M]anipulative trading practices . . . are deceptive within the meaning of the rule."); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (noting that "manipulation," as used in this context, "refers generally to practices, such as wash sales, matched orders, or rigged prices, *that are intended to mislead investors by artificially affecting market activity*" (emphasis added)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (suggesting that manipulative conduct "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.").[22]  Therefore, insofar as it is predicated

---

[22]  Mr. Gordon also makes something of a causation argument. Specifically, he contends that the observed price spikes in the stocks during the fraudulent "pumping" period were substantially attributable to the circumstances of the particular industries in which the companies operated (and, thus, presumably not attributable to the conspirators' fraudulent conduct).  For instance, the price of home-building company stocks was seemingly correlated with Hurricane Katrina.  As a general matter, his briefing on this issue is skeletal at best.  We would be justified in refusing to address it on that grounds alone. *See Burrell v. Armijo*, 603 F.3d 825, 835 (10th Cir. 2010) ("Without specific and reasoned argument . . . , we have no basis to reverse the district court's decision.").  Nonetheless, as the government points out, "the jury was not

(continued...)

upon the assertion that there was no evidence of actionable false and material statements or omissions made with respect to the promotional campaigns, with a fraudulent intent, Mr. Gordon's sufficiency-of-the-evidence challenge is wholly without merit.

Finally, the government charged Mr. Gordon with a violation of 18 U.S.C. § 1001, on the grounds that he falsely denied knowledge of the Deep Rock fax promotion to an SEC official (Count 22). *See* R., Vol. I, at 75. Mr. Gordon challenges his conviction under § 1001 on the grounds that "[i]f the fax blasts were legal, then whatever [he] told [SEC investigators] about them would not have been material." Aplt. Opening Br. at 38. However, in light of the foregoing discussion, Mr. Gordon's argument must fail because the promotional campaigns (including the fax blasts) were not legal.

In any event, to establish "materiality" under § 1001, the government had to show that the statement had "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (alteration in original)

---

[22](...continued)
required to accept [alternative theories for the prices' rise and fall], particularly where the promotions hyped the stock based on the same external events that Gordon claims caused the price movements." Aplee. Br. at 25; *cf. United States v. Haymond*, 672 F.3d 948, 956 (10th Cir. 2012) (noting that "[t]he jury was not *required* to credit [the defendant's] assertions" on his own view of the evidence (emphasis added)).

(quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)) (internal quotation marks omitted). Here, a rational trier of fact could have concluded that Mr. Gordon's statement denying any knowledge of the Deep Rock fax promotions satisfied this understanding of "materiality" because Deep Rock was one target in the SEC's investigation, and a false statement by Deep Rock's attorney that he had no knowledge of a promotional campaign—which, at that time, was potentially illegal—could have influenced the agency's decision on how to craft its investigative focus. *See id.* at 522–23 (noting that "the jury [must be allowed] to pass on the 'materiality' of [the defendant's] false statements").

In other words, any rational trier of fact could have concluded that Mr. Gordon's denial was capable of influencing the SEC's investigation of the underlying scheme. *See* R., Vol. VIII, at 1777 (Investigator Draddy responding, "Absolutely" to the question, "Was the information about fax promotions for Deep Rock relevant [and important] to the SEC's investigation?"); *see also United States v. Oldbear*, 568 F.3d 814, 825 (10th Cir. 2009) (holding that a false statement made to an FBI agent that the defendant had "no information" regarding the matter under investigation was "material" under § 1001(a)(2) because the statement related to one of the issues that was important to the underlying investigation). For that reason, Mr. Gordon's challenge to Count 22 also must

fail.[23]

## 2. *Legality of the opinion letters*

Mr. Gordon also lodges a challenge to the sufficiency of the evidence with

respect to the allegations that he prepared or endorsed "false" opinion letters for

Deep Rock, National Storm, and IPG.[24]  According to Mr. Gordon,

> Robert Bertsch never appeared to testify that the two opinion
> letters he wrote [for Ednet, the company IPG had merged with,
> and National Storm] were forgeries or that the companies he
> wrote about had not been formed at least two years earlier or that
> he had not determined that the shareholders listed in the opinion

---

[23]    Embedded in Mr. Gordon's brief is the additional contention that he had an "ethical obligation" to protect the information about the Deep Rock promotional campaign because, at the time he was asked about it, he was representing Deep Rock.  Aplt. Opening Br. at 38.  However, Mr. Gordon points us to no privilege permitting an attorney to lie to a government official purportedly to protect his client's interests, and we certainly are not aware of anything of the sort.  Aside from the fact that Mr. Gordon appears to have been simultaneously or concurrently representing his clients in the face of seemingly patent conflicts of interest, *see* Okla. Rules of Prof'l Conduct R. 1.7 (noting that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which includes cases where "there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer"); *see also* Okla. Rules of Prof'l Conduct R. 1.7 cmt. 10 ("[I]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice."), had he actually been concerned with his clients' confidences, he could have declined to answer *at all*, *see* Okla. Rules of Prof'l Conduct R. 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent . . . .").  Deceit is not an accredited tool of which a lawyer may avail himself in the representation of a client.

[24]    Mr. Gordon asserts these challenges at two points in his brief—in "Proposition Two" and "Proposition Four."  However, we address his arguments here under the same heading for clarity.

letters had not obtained their stock as Rule 144 required. Similarly, the opinion letter written by [Mr. Gordon] involved a company, Deep Rock, whose stock, the testimony established, had been distributed to numerous parties, many in the Clark family [and could thus be transferrable through "tacking"], more than a decade before. There was no evidence [Mr. Gordon] knew that any shares of stock ultimately traded as a result of his opinion letter should not have done so or that the opinion letter failed to qualify for the Rule 144 exemption.

Aplt. Opening Br. at 34. These assertions, however, are refuted by the record. There was ample evidence for a rational jury to determine that the information in the opinion letters was false, and that Mr. Gordon knew it. In fact, there was evidence that he laid the groundwork for many of the false representations. *See, e.g.*, R., Vol. VIII, at 1493 ("[Mr. Gordon] told me that I should go talk to a couple of my friends, offer them money, a thousand dollars a piece or something in that range, and ask them to do me a favor to say they were shareholders of the company."); *id.* at 1303–07 (Trial Test. of Donald Clark, dated Apr. 13, 2010) (referencing a transfer document issued by Mr. Gordon's law office that purported to establish that Mr. Clark (as a shareholder-seller) had acquired Deep Rock shares "more than two years prior" despite the fact that Mr. Clark had never advised Mr. Gordon or anyone in his law office to this effect (internal quotation marks omitted)); *id.* at 1495 (stating that share transfer documents "were backdated to show that the shareholders owned the stock longer than they actually did, so upon becoming a public company those shares would be freely tradable to

sell in the market"); *id.* at 1279 (Trial Test. of Tom Klenda, dated Apr. 13, 2010) (noting that, despite the fact that he was listed as trustee for a trust that owned 2,000,000 shares of Deep Rock stock, which Mr. Gordon indicated that he wanted to transfer in a Rule 144 opinion letter, he "was not involved in [the] transaction [that referenced him and] had no knowledge [of it]").[25]  Consequently, Mr. Gordon's sufficiency-of-the-evidence argument with respect to the National Storm and Deep Rock opinion letters is meritless.

Mr. Gordon, under Proposition Four, also argues that the government's

---

[25]     Mr. Gordon also claims that, under Rule 144, "tacking of stock gifted to another extends the holding period to include the period held by the donor," and in light of this, many of the shareholders listed actually qualified under the rule.  Aplt. Reply Br. at 20.  *See generally M & A West, Inc.*, 538 F.3d at 1051 ("Rule 144(k) further permits purchasers of restricted securities who acquire from non-affiliates in private transactions to comply with the two-year holding period by adding—'tacking'—the holding period of the prior non-affiliate holder to their own holding period.  Tacking is not permitted, however, if the purchaser acquires the securities directly from an affiliate in a private transaction."); *Black's Law Dictionary* 1590 (defining "tacking" as "[t]he joining of consecutive periods of possession by different persons to treat the periods as one continuous period").  However, even if the true facts of the shareholder ownership would have permitted the requirements of Rule 144 to be satisfied by tacking—and it is not clear to us that this is true, based upon Mr. Gordon's cursory discussion of the factual underpinnings of the argument—the evidence established that Mr. Gordon elected to use fraudulent means to make the stocks freely tradeable.  More specifically, the evidence demonstrated that Mr. Gordon knew the representations in the documents underlying the opinion letters were materially false, but nonetheless directed their creation.  *See* R., Vol. VIII, at 1305–07; *see also id.* at 1495 (noting that documents, which purported to set forth that paid "shareholders" owned 18th Letter stock, "were backdated to show that the shareholders owned the stock longer than they actually did" and "Mr. Gordon kn[e]w that [shareholders] would be signing backdated documents").

evidence regarding the IPG transaction was insufficient, and thus, "there is no wire fraud [as to Count 23]." Aplt. Opening Br. at 40. Specifically, he claims that the witness testimony established that the opinion letter prepared for IPG—along with backdated corporate documents that Mark White signed—was accurate, and that backdating corporate documents to bolster the letter was not illegal in this context.

"Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Ransom*, 642 F.3d 1285, 1289 (10th Cir. 2011) (footnote omitted) (quoting *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008)) (internal quotation marks omitted); *accord United States v. Cooper*, 654 F.3d 1104, 1116 (10th Cir. 2011). Mr. Gordon does not suggest that a false opinion letter fabricated in order to facilitate the free trading of IPG shares would not constitute a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises; rather, his argument attacks the factual predicate—*viz.*, he contends that there was no evidence that the IPG opinion letter actually was false or that it failed to meet the requirements of Rule 144.

Even assuming, as a general proposition, that backdating corporate

documents is not necessarily illegal, *see generally United States v. Reyes*, 577 F.3d 1069, 1073 (9th Cir. 2009) ("Backdating is not itself illegal . . . ."), the opinion letter that served as the basis for Count 23 in this case relied on more than mere backdated corporate records; it falsely represented that the shareholders had *advised* Mr. Bertsch's office that the relevant shares of Ednet—the company with which IPG was merged—had been acquired in accordance with the requirements of Rule 144. For instance, the letter at the outset notes that the drafter "ha[d] been advised *by* [the shareholders] . . . that a sale will occur of 1,000,000 shares of Common Stock." Aplt. Addendum, ex. 19, at 1 (Letter from Robert Bertsch to Routh Stock Transfer, Inc., dated Sept. 17, 2004) (emphasis added). Further, on the second page, it notes that "*we are advised* that the Shares were deemed to be acquired by the Seller more than two years prior to the sale." *Id.* at 2 (emphasis added). Neither of these assertions was true.

Given the reference to the shareholders actually providing the "advice" regarding their holding status, it is not surprising that the transfer agent was misled into issuing the non-restrictive legends for IPG. *See* R., Vol. VIII, at 1034–35 (Trial Test. of Jason Freeman, dated Apr. 12, 2010) (testifying that he relied on the representations made in the IPG opinion letter in order to "issue free-trading shares"). We are obliged when reviewing the sufficiency of the evidence to give the government the "reasonable inferences to be drawn from it." *Mendez*, 514 F.3d at 1041. And here, the government offered evidence that Mr.

-45-

Gordon intended to mislead by creating this letter and directing Mr. Bertsch to sign it. *See* R., Vol. VIII, at 1604 (answering, "Yes. It came from his office," when asked, "Did Mr. Gordon have an understanding this was a false document when he sent it to you?"); *id.* (noting that Mr. Bertsch "sign[ed] a false opinion letter" in order to "complete the transaction"). Any rational trier of fact could have found the misrepresentations to be false and fraudulent. *Cf. Cooper*, 654 F.3d at 1118–19 (concluding that the evidence was sufficient to sustain a wire fraud conviction where the government presented evidence at trial that the defendant transmitted false information by wire to induce individuals to continue to participate in a pyramid scheme).[26] In sum, Mr. Gordon's challenge to his conviction of Count 23 is without merit.

---

[26] Moreover, any rational trier of fact could have found the representations to be material. *See Ransom*, 642 F.3d at 1289–90 (noting that "the materiality of a falsehood is a required element of wire fraud"). "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Irvin*, 682 F.3d at 1267 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (internal quotation marks omitted); *see United States v. Lawrence*, 405 F.3d 888, 901 (10th Cir. 2005) ("To determine whether a statement is material the appropriate test is to examine whether it has a natural tendency to influence, or is capable of influencing a decision or action by another."). Here, the false statements concerned whether *the shareholders* had advised Mr. Bertsch of the factual predicate for Rule 144 certification; it is beyond peradventure that these statements had a natural tendency to influence a transfer agent's issuance of non-restricted certificates. *Cf. Lawrence*, 405 F.3d at 901 (holding that the evidence was sufficient to sustain convictions of, *inter alia*, wire fraud, where the government showed the defendant's fraudulent use of a seemingly valid physician provider number and Medicare codes, which had a "natural tendency to influence" and "induce payment" of false claims).

### 3.    *Attempted Obstruction of an Official Proceeding*

Mr. Gordon also challenges Count 24, which charged him with a violation of 18 U.S.C. § 1512(c)(2)—that is, with corruptly obstructing, impeding, or influencing, or attempting to do so, an official proceeding. This charge was based upon the government's contention that Mr. Gordon directed Mr. Singer to "sign a backdated agreement purporting to memorialize a sale of [IPG] stock that never took place," Aplee. Br. at 27, and that Mr. Gordon actually created such a false document, with Mr. Singer's help. The government argued that Mr. Gordon intended to present the document in the government-initiated civil forfeiture proceeding, in order to prevent forfeiture of his home.

As we noted in Part I, *supra*, Mr. Singer gradually sold IPG shares on Mr. Gordon's behalf, and at one point in November 2005, wire-transferred roughly $1.7 million of the proceeds to "pay off the mortgage on [Mr. Gordon's] house." R., Vol. VIII, at 1610. This allegedly fraudulent IPG-related conduct was the predicate for the government's forfeiture action regarding Mr. Gordon's house. According to Mr. Singer, around December 2007, Mr. Gordon directed him to endorse a false, backdated document that purported to memorialize a sale of IPG stock between Mr. Gordon and Mr. Singer. This sale supposedly took place in October 2005—prior to the November 2005 wire transfer—and the documents evinced a purchase price of approximately $1.9 million, an amount that somewhat

exceeded, but was similar to, the wire-transfer amount of $1.7 million. Mr. Singer testified that, at Mr. Gordon's request, he returned to Mr. Gordon a signed copy of the purported agreement and a blank copy. Mr. Singer identified for the jury a record of a contemporaneous electronic communication from Mr. Gordon in which he informed Mr. Singer that he was "going to go w/unsigned version and let them no [sic] that the original [was] lost but this was the agreement." R., Vol. VIII, at 1665 (internal quotation marks omitted). It is undisputed that the jury never heard evidence relative to whether Mr. Gordon ever presented either the signed or blank version of the purported purchase agreement to the government or in an official proceeding.[27] Mr. Singer confirmed, however, that "there was no

---

[27] Apparently, as a matter of litigation strategy, the government elected not to present evidence to the jury regarding Mr. Gordon's use of the purported agreement because (a) the government steadfastly maintained that it was sufficient proof of the offense that, with the aim of defeating the forfeiture of his home, Mr. Gordon corruptly directed Mr. Singer to sign a backdated, fabricated document and that, with Mr. Singer's help, Mr. Gordon actually created such a false document, and (b) omitting such evidence of Mr. Gordon's use of the document would permit the government to avoid conceivably turning Mr. Gordon's counsel into witnesses. As to the latter point, outside of the jury's hearing, Mr. Gordon's counsel raised an objection with the district court regarding Mr. Singer's testimony. They informed the court that Mr. Gordon had informed them that he had gone to Mr. Singer to obtain a copy of the purported purchase agreement; and when Mr. Singer could not unearth it, Mr. Gordon wrote down on a piece of paper the basic terms of the agreement; and, carrying this paper with them, counsel met with the government's lawyers in January (apparently) 2008 to discuss the piece of paper and the purported purchase agreement, with the objective of convincing the government that there was nothing wrong with Mr. Singer's 2005 transfer of funds to Mr. Gordon.

(continued...)

-48-

original" agreement and that "[t]he only thing that happened prior [i.e., in 2005] was [his] selling [IPG] stock" and transferring sales proceeds to Mr. Gordon. *Id.* at 1666; *see id.* at 1610 (answering, with respect to the $1.7 million dollar wire transfer to Mr. Gordon, in response to the government's question, "Were those also the proceeds of the sale from the [IPG] stock?," "That's correct").

"Under § 1512(c)(2), any person who 'corruptly . . . obstructs, influences, or impedes any official proceeding or attempts to do so, shall be fined under this title or imprisoned not more than 20 years or both.'" *United States v. Phillips*, 583 F.3d 1261, 1263 (10th Cir. 2009) (quoting 18 U.S.C. § 1512(c)(2)); *accord United States v. Ahrensfield*, 698 F.3d 1310, 1324 (10th Cir. 2012). Under this provision, "a defendant must act with the intent that his actions will influence a[n

[27](...continued)

Mr. Gordon's counsel argued to the court that Mr. Singer's testimony would implicate their efforts (on Mr. Gordon's behalf) to use the purported purchase agreement to sway the government's forfeiture decision and they were "going to wind up in the middle of this and this is going to conflict us both out of the case" and cause a mistrial. R., Vol. VIII, at 1651; *see id.* at 1649 ("[W]e're going to wind up conflicted out of this case and cause a mistrial and that's not what we're trying to do here."). The government contended that the argument of Mr. Gordon's counsel was "a red herring" because Mr. Singer "is here to testify about what happened between him and Mr. Gordon," *id.* at 1654, and "the fact that they [i.e., Mr. Gordon's counsel] were the vehicle for Mr. Gordon's attempt to obstruct an investigation is immaterial," *id.* at 1652. According to the government, "[t]he critical fact here is . . . that the document [i.e., the purchase agreement] didn't exist, it never existed, and that's what this witness [that is, Mr. Singer] is going to testify about." *Id.* at 1652. With the government's representations regarding the scope of Mr. Singer's expected testimony in mind, the court overruled the objection of Mr. Gordon's counsel.

applicable] proceeding."  *Phillips*, 583 F.3d at 1263.

Mr. Gordon essentially makes two arguments.  First, he argues that "[t]he testimony never established that any 'official proceeding' was set or even contemplated during this time . . . [because the] in rem action against [the] residence . . . [was] stayed" in November 2007 and remained so at the time the alleged "obstruction" occurred, and the product of the alleged acts was intended to be presented to government lawyers, not the court.  Aplt. Reply Br. at 23. Second, he suggests that the evidence simply did not show that he is guilty under § 1512(c)(2).

"[O]fficial proceeding" in this context is defined as, *inter alia*, "a proceeding before a judge or court of the United States."  18 U.S.C. § 1515(a)(1)(A).  Mr. Gordon claims that the government's evidence only showed that he wanted the fabricated share-purchase agreement for his records when he was meeting with the government regarding the forfeiture of his house and that, during the period in which he allegedly sought fabrication of the purchase agreement, the government-initiated civil forfeiture proceedings were technically stayed.  These facts, he suggests, caused any proceeding to lose its character as "official."  These argument do not move beyond the threshold, however.  In particular, we conclude that they are waived—specifically, his arguments aimed at showing that a stayed proceeding cannot constitute an "official proceeding" for

purposes of § 1512(c)(2), and that "[a]n ad hoc meeting between lawyers," Aplt. Reply Br. at 23, similarly cannot constitute an official proceeding, such that the presentation of fraudulent documents in such a meeting could be deemed criminally actionable conduct.

Mr. Gordon did not specifically present these arguments in his opening brief; rather, he attempts to formulate them for the first time in his reply brief. It is well settled that "[t]his court does not ordinarily review issues raised for the first time in a reply brief." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). Even then, the arguments are presented in a perfunctory and conclusory fashion, and we are rightly hesitant to definitively opine on such legally significant issues when they have received such cursory treatment. *See, e.g.*, *Cooper*, 654 F.3d at 1128 ("It is well-settled that '[a]rguments inadequately briefed in the opening brief are waived.'" (alteration in original) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998))). Consequently, to the extent that Mr. Gordon purports to raise these arguments as a separate basis for error, we conclude that they are waived.

Second, Mr. Gordon appears to contest whether the evidence actually showed that the creation of the false purchase agreement constituted an "obstruction," where there was no evidence before the jury that the document was actually given to a government official or to the court. However, in addition to

its substantive provisions, § 1512(c)(2) also includes an attempt provision—authorizing conviction of an individual who "corruptly . . . *attempts* [to obstruct or impede]" an official proceeding, 18 U.S.C. § 1512(c)(2) (emphasis added)—and Mr. Gordon was charged in Count 24 both with the substantive offense and with the inchoate crime of attempt. Therefore, in assessing the sufficiency of the evidence regarding Count 24, we are free to focus on whether any rational finder of fact could have found Mr. Gordon guilty of the attempt offense (as opposed to the substantive offense), and we elect to do so.

"An attempt [generally] requires both (1) an 'intent to commit the substantive offense,' and (2) the 'commission of an act which constitutes a substantial step towards commission of the substantive offense.'" *United States v. Washington* (*Deandre Washington*), 653 F.3d 1251, 1264 (10th Cir. 2011) (quoting *United States v. Vigil*, 523 F.3d 1258, 1267 (10th Cir. 2008)); *accord United States v. Irving*, 665 F.3d 1184, 1195 (10th Cir. 2011).

"A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *United States v. Fleming*, 667 F.3d 1098, 1107 (10th Cir. 2011) (quoting *Deandre Washington*, 653 F.3d at 1264) (internal quotation marks omitted). "The fact that further, major steps remain 'before the crime can be completed does not preclude a finding that the steps already undertaken are substantial.'" *Irving*, 665

-52-

F.3d at 1196 (quoting *United States v. Savaiano*, 843 F.2d 1280, 1297 (10th Cir. 1988)). "[A] substantial step is appropriately found where the defendant undertook 'an act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of [a] particular crime.'" *Fleming*, 667 F.3d at 1107 (second alteration in original) (quoting *Deandre Washington*, 653 F.3d at 1264). "Importantly, the act or acts 'must be strongly corroborative of the firmness of the defendant's criminal intent.'" *Irving*, 665 F.3d at 1196 (quoting *United States v. Bunney*, 705 F.2d 378, 381 (10th Cir. 1983)); *see also United States v. Lucas*, 499 F.3d 769, 781 (8th Cir. 2007) (en banc) (concluding that the defendant's "earnest" request that two other individuals "claim ownership of [a] firearm . . . was enough to prove that [he] took a 'substantial step' toward obstruction of justice [under § 1512(c)(2)]").

Thus, the government was required to prove beyond a reasonable doubt (1) that Mr. Gordon intended to "corruptly" obstruct an official proceeding (here, the civil forfeiture proceeding), and (2) that he committed a substantial step toward the commission of the intended "obstruction." Acting "corruptly" within the meaning of § 1512(c)(2) means acting "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [forfeiture proceeding]." *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (alteration in original) (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)) (internal quotation marks omitted); *cf.*

*United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979) (in defining "corruptly" under 18 U.S.C. § 1503, noting that "corruption" means "[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others" (quoting *Bouvier's Law Dictionary*, Vol. I) (internal quotation marks omitted)).

Any rational trier of fact could have concluded that Mr. Gordon was guilty of attempting to violate § 1512(c)(2). First, as for his corrupt intent, the government's evidence showed that Mr. Gordon directed Mr. Singer to sign a backdated agreement that memorialized a sale of IPG stock between the two. As the jury heard, "he wanted . . . to have it for his records when he was . . . meeting with the government regarding the forfeiture or seizure of his house." R., Vol. VIII, at 1663. The evidence further showed that the share-purchase agreement specified that it was executed in October 2005—prior to Mr. Singer's November 2005 wire transfer of funds to Mr. Gordon—but Mr. Singer "never had an agreement regarding the shares of [IPG]" with Mr. Gordon. *Id.* at 1656. When Mr. Gordon asked for his endorsement on a backdated share-purchase agreement, Mr. Singer understood him "to be asking . . . to create false documents," and Mr. Singer did so because "[Mr. Gordon] was a friend, [and Mr. Singer] was trying to help him out." *Id.* at 1663.

Any rational jury could have determined that the creation of these false

documents was for the corrupt purpose of redirecting the government, based upon false pretenses, away from property that it was trying to seize (i.e., Mr. Gordon's home) in an official proceeding and that Mr. Gordon could foresee that the document would have this effect. *See Friske*, 640 F.3d at 1293 (noting that, in making this showing, the government must establish that the "[defendant] knew that his actions were likely to affect a forfeiture proceeding"); *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007) (concluding that the defendant had "failed to show that the evidence was insufficient to establish a nexus between his actions and obstruction of [a] proceeding" where he completed "[a] forged Order [that] appeared to render moot [a litigation opponent's] application to the Second Circuit for a writ of mandamus, [because] it was foreseeable that upon receiving the forged Order, [the opponent] would withdraw the application").

Furthermore, any rational jury could conclude that the evidence sufficiently established that Mr. Gordon took a "substantial step" toward the obstruction. Mr. Singer's testimony suggested that Mr. Gordon intended to imminently use the false documents. *See* R., Vol. VIII, at 1665–66, 1668 (discussing text messages where Mr. Gordon implies that he was going to soon present a version of the unsigned (and false) document to the government after its receipt). As noted, even if "major steps remain," a rational finder of fact may determine that the steps already completed are substantial. *Irving*, 665 F.3d at 1196; *see Deandre Washington*, 653 F.3d at 1266 (noting that a "substantial step" may be established

-55-

even though "several steps . . . remain before the planned [crime] . . . [actually] take[s] place").

More specifically, "[i]f the activity ha[s] proceeded to a further length, that is, if a *tangible act* which constituted proximate and tangible evidence of a real effort had emerged, the government's [charge] [is] more tenable." *Deandre Washington*, 653 F.3d at 1265 (first and third alterations in original) (quoting *United States v. Monholland*, 607 F.2d 1311, 1317 (10th Cir. 1979)) (internal quotation marks omitted). And we look to see whether the act or acts strongly corroborate the firmness of the defendant's intent to carry out the substantive offense. *See Irving*, 665 F.3d at 1198. Here, any rational finder of fact could have found that Mr. Gordon's direction to Mr. Singer to endorse a backdated share-purchase agreement and Mr. Gordon's actual creation of such an agreement (with Mr. Singer's help) amounted to a tangible act. And that this act strongly corroborated the firmness of Mr. Gordon's corrupt intent to obstruct an official proceeding. In particular, there was no evidence before the jury that Mr. Gordon expressed second thoughts about his corrupt plan, or in any other respect changed his mind about the criminal endeavor.

Unlike in *Monholland*, this is not a situation where a defendant just engaged in "mere abstract talk." 607 F.2d at 1318; *cf. Irving*, 665 F.3d at 1200–01 (concluding, that defendant's conduct, "*viewed in the aggregate*"

-56-

amounted to more than abstract talk, where he "active[ly] solicit[ed]" an undercover agent to secure a killer for a murder-for-hire contract, achieved the "actual consummation of a murder-for-hire contract," and took "concrete actions to facilitate the completion of the contract"). In responding to Mr. Gordon's motion for judgment of acquittal, the government forcefully hammered this point home:

> [T]he fact that Mr. Gordon never lied to [the] court[] doesn't matter. The count alleges that he endeavored to obstruct justice. He endeavored, not by thinking about it, not by walking around and talking to himself about it . . . but by doing something, by talking to Rick Singer about it, by sending him documents, and by instructing . . . Rick Singer to backdate the document and create a false document [and that] is sufficient.

R., Vol. VIII, at 2378–79. Thus, taking account of all of the circumstances, we conclude that the government presented sufficient evidence for a rational factfinder to conclude that Mr. Gordon possessed the requisite corrupt intent to obstruct or impede an official proceeding and took a substantial step to accomplish that end. Accordingly, we reject Mr. Gordon's sufficiency-of-the-evidence challenge to his conviction of Count 24.[28]

---

[28] Mr. Gordon also argues that there is no indication that he "intentionally harassed" Mr. Singer. *See* Aplt. Reply Br. at 24 (discussing § 1512). But he points to no portion of § 1512(c)(2) that contains an intentional harassment component, nor any case that recognizes such a patina on the provision. Furthermore, like his argument on the scope of § 1512(c)(2), Mr. Gordon's argument on this issue is fragmentary and cursory. Thus, we decline to

(continued...)

## C.    Fifth Amendment

Mr. Gordon complains that the district court erred in permitting the government to insinuate guilt by introducing evidence that infringed upon his Fifth Amendment right to remain silent.  At trial, the government offered the testimony of Mr. Lindberg (over objection), which established that he and Mr. Gordon had discussed who should be permitted to testify in the proceedings before the SEC.  Moreover, two witnesses—who were incidentally involved in the scheme—testified that Mr. Gordon advised them to take the Fifth Amendment. The testimony was offered to corroborate Mr. Lindberg's testimony that he and Mr. Gordon had essentially calculated a cover-up strategy.  Mr. Gordon claims that this tactic tainted the invocation of *his own* Fifth Amendment right not to testify at trial, which he in fact exercised.

"We review a district court's evidentiary rulings for an abuse of discretion, considering the record as a whole." *United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005).  However, "[w]e review de novo the extent of constitutional rights." *Jones*, 160 F.3d at 645; *see United States v. Rivas-Macias*, 537 F.3d 1271, 1278 (10th Cir. 2008) ("Whether an individual may properly invoke the privilege against self-incrimination is a question of law, which we review de novo."); *see also United States v. Bright*, 596 F.3d 683, 690 (9th Cir. 2010)

[28](...continued)
pursue the matter further.  *See Cooper*, 654 F.3d at 1128.

(collecting cases and noting that it "review[s] de novo a district court's application of the Fifth Amendment privilege against self-incrimination").

"The Fifth Amendment provides, in relevant part, that no person '*shall be compelled in any criminal case to be a witness against himself.*'" *United States v. Mike*, 632 F.3d 686, 697 (10th Cir. 2011) (quoting U.S. Const. amend. V)). It "protects an accused . . . from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761 (1966). It further prevents "adverse comment[s] . . . on a defendant's failure to take the stand in a criminal trial." *Griffin v. California*, 380 U.S. 609, 615 (1965) (Harlan, J., concurring); *see United States v. Templeman*, 481 F.3d 1263, 1265 (10th Cir. 2007) ("[A] defendant's Fifth Amendment privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's exercise of his right not to testify."); *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006).

Mr. Gordon contends that the government's evidence tainted his own invocation of the Fifth Amendment privilege during trial.[29] He reasons that the

---

[29]     Mr. Gordon appears to make a related argument that "[a] lawyer's effort to advise his client of the full range of legal options available, including taking the Fifth Amendment, . . . cannot be portrayed as . . . wrongdoing" as a general matter. Aplt. Opening Br. at 44. In support he cites *United States v. Farrell*, 126 F.3d 484 (3d Cir. 1997), a Third Circuit case that dealt primarily with the meaning of "corrupt persuasion" under the witness-tampering statute, *see* 18 U.S.C. § 1512(b)(3). Mr. Gordon's related argument lacks merit. In

(continued...)

evidence introduced by the government (noted above) insinuated that "taking the

Fifth" is what guilty people do. But the evidence here did no such thing. As

discussed, it is absolutely true that "a defendant's Fifth Amendment privilege

against self-incrimination prohibits a prosecutor from commenting on a

defendant's exercise of his right not to testify." *Templeman*, 481 F.3d at 1265.

However, "[w]hen evaluating comments [or evidence] bearing upon a defendant's

failure to testify, we look to see if the language used was 'manifestly intended to

be a comment on the defendant's failure to testify' or was of 'such character that

the jury would naturally *and necessarily* take it to be such a comment.'" *Id.*

(emphasis added) (quoting *United States v. Rahseparian*, 231 F.3d 1267, 1273

(10th Cir. 2000)); *see United States v. Ivory*, 532 F.3d 1095, 1100 (10th Cir.

2008) ("[T]o determine whether . . . [a] remark will be considered a comment on

the defendant's failure to testify[,] . . . [we must assess] whether the language

---

[29](...continued)
particular, his reliance on *Farrell* is misguided. At issue there was whether the defendant's conduct itself was sufficient to support a criminal charge under the witness-tampering statute. *See Farrell*, 126 F.3d at 485–86. Specifically, *Farrell* dealt with whether evidence of a defendant persuading his alleged co-conspirator to not reveal information to authorities could constitute "corrupt persuasion" under 18 U.S.C. § 1512(b). *Id.* at 488–89. The court found that "more culpability is required for a statutory violation [of § 1512(b)] than that involved in the act of attempting to discourage disclosure in order to hinder an investigation." *Id.* at 489. However, *Farrell* tells us nothing about whether evidence relating to third parties' invocation of the Fifth Amendment privilege may detrimentally taint a defendant's invocation of the privilege; in other words, *Farrell* says nothing about the issue before us.

used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." (quoting *United States v. Barton*, 731 F.2d 669, 674 (10th Cir. 1984)) (internal quotation marks omitted)).

Mr. Gordon has pointed to no statement in the record that comes close to meeting this standard. Instead, he simply asserts conclusorily that the government's conduct indirectly satisfies it. *See* Aplt. Opening Br. at 44 ("By its action, [the government] indirectly accomplished what has routinely been held justification for a mistrial—commenting on a defendant's right to remain silent."). That is not enough. *Cf. In re Martinez*, 126 F. App'x 890, 899 (10th Cir. 2005) ("[Appellants] simply continue to assert a general Fifth Amendment claim that answering the certified questions would impinge on their rights against self-incrimination. This is insufficient to invoke the Fifth Amendment.").

To the contrary, the evidence related to Mr. Gordon's discussions with others about their testimony in an SEC proceeding; it did not pertain to Mr. Gordon's invocation of his own Fifth Amendment right in his criminal trial. The Fifth Amendment prevents a prosecutor from "comment[ing] on the failure of *the defendant* to provide . . . evidence," or to speak. *Rahseparian*, 231 F.3d at 1274 (emphasis added); *see United States v. Hamilton*, 587 F.3d 1199, 1217 (10th Cir. 2009). It does not prevent the evidence elicited in this case because that evidence

did not reasonably (or necessarily) refer to Mr. Gordon's invocation of his own Fifth Amendment right not to testify. *See Nelson*, 450 F.3d at 1212 ("The general rule of law is that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised." (quoting *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991)) (internal quotation marks omitted)); *see also United States v. Hanrahan*, 508 F.3d 962, 968 (10th Cir. 2007) (rejecting an argument that the prosecution's use of the defendant's prior testimony was in some way an effort to comment on his decision not to testify at the trial at which it was introduced, because the "prosecutor revealed nothing that . . . would cause the jury to consider it a comment on [the defendant's] choice not to testify"). It is for this reason that we reject Mr. Gordon's Fifth Amendment challenge. As the district court aptly noted, Mr. Gordon "should not be permitted to perpetuate . . . a stock-manipulation scheme and claim that evidence of the cover-up is somehow protected simply because he is an attorney." R., Vol. VIII, at 371 (Trial Tr., dated Apr. 8, 2010).

**D.    Juror Dismissal**

Mr. Gordon argues that the district court erred in excusing a petit juror without adequate cause. At trial, after the government rested its case, a member of the court's staff was informed by a juror that she wanted to serve as an

alternate because her continued presence on the jury "could affect the outcome of the case." R., Vol. VIII, at 2468. The juror further commented that, "perhaps" in light of her "take on personalities . . . and [her] take on some of the bits of th[e] case . . . [she] may be a roadblock." *Id.* at 2478. After carefully conducting a one-on-one inquiry with each member of the panel—during which time the court asked whether this particular juror had made comments that could have contaminated the jury[30]—it decided, over Mr. Gordon's objection, that it would excuse her "out of an abundance of caution." *Id.* at 2505.

"We have stated that the determination of 'whether to excuse a juror rests on whether the juror can remain impartial.'" *United States v. Brothers*, 438 F.3d 1068, 1071 (10th Cir. 2006) (quoting *United States v. Black*, 369 F.3d 1171, 1176 (10th Cir. 2004)), *abrogated in part on other grounds as recognized in United States v. Soza*, 643 F.3d 1289, 1291 (10th Cir. 2011); *see also United States v. Wood*, 299 U.S. 123, 145–46 (1936) ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."). "This rule is based on a defendant's Sixth Amendment right to a fair trial 'by an impartial jury.'" *Brothers*, 438 F.3d at 1071 (quoting U.S. Const. amend. VI).

---

[30]     It was determined, ultimately, that "she didn't contaminate the rest of the pool." R., Vol. VIII, at 2504.

The district court has broad discretion in determining whether to excuse a juror for potential bias. *See Bornfield*, 145 F.3d at 1132 ("It is well settled that the district court has broad discretion in determining how to handle allegations of juror bias."); *United States v. McIntyre*, 997 F.2d 687, 697 (10th Cir. 1993) ("Whether an individual is qualified to serve as a fair and impartial juror is a decision that is firmly within the discretion of the district court."); *see also Black*, 369 F.3d at 1176. And the decision to dismiss—or not to dismiss—a juror is reviewed only for an abuse of discretion. *See Black*, 369 F.3d at 1176–77; *see also Skilling v. United States*, 130 S. Ct. 2896, 2918 (2010) ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty."); *United States v. Bolden*, 596 F.3d 976, 980–81 (8th Cir. 2010) (affirming the district court's dismissal of a juror that was made largely out of an abundance of caution in light of the juror's brief conversation with the defendant's girlfriend); *Bornfield*, 145 F.3d at 1132–33 (affirming the district court's dismissal of a juror as an alternate where the juror expressed displeasure with the pace of the trial).

"Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the

lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chanthadara*, 230 F.3d 1237, 1248 (10th Cir. 2000) (quoting *United States v. Thompson*, 908 F.2d 648, 650 (10th Cir. 1990)) (internal quotation marks omitted); *cf. United States v. Warner*, 498 F.3d 666, 689 (7th Cir. 2007) ("[A] district court abuses its discretion in the context of juror removal only 'if the juror was discharged without factual support or for a legally irrelevant reason.'" (quoting *United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002))). *Compare Brothers*, 438 F.3d at 1071–72 (applying an abuse-of-discretion standard to the district court's decision to remove a juror for cause), *with Black*, 369 F.3d at 1176–77 (applying an abuse-of-discretion standard to the district court's decision *not* to remove a juror for medical reasons).

Mr. Gordon contends that the district court essentially lacked good cause for excusing the juror. However, we need not address whether the district court erred in discharging the juror. Even if it did so, we will not reverse "unless it resulted in prejudice to the defendant." *Brothers*, 438 F.3d at 1072; *see* 2 Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure* § 388, at 659 (4th ed. 2009) ("Defendant is entitled to a new trial because of the substitution of an alternate juror prior to the start of deliberations *only if he can demonstrate that he was prejudiced by the substitution*." (emphasis added)); *id.* at 659 n.22 (collecting cases); *see also id.* at 659–60 (noting that, in showing prejudice, "it is

not enough that the juror who was excused was thought by the defendant to be biased in his favor"). And we conclude that there was no such prejudice to Mr. Gordon.

Here, the juror in question "gave no indication [as to] which side she favored," Aplee. Br. at 59, and Mr. Gordon "fails to point to any concrete factor that moves [his] assertion [of prejudice] beyond the realm of mere speculation," *Brothers*, 438 F.3d at 1073. More specifically, although Mr. Gordon suggests that he was denied the participation of a "highly conscientious juror," he fails to demonstrate that the remaining jurors were not just as conscientious or fair. *See Brothers*, 438 F.3d at 1072 ("[T]here is no indication that the court's replacement of the juror in question with an alternate juror resulted in a biased jury or an otherwise unfair trial."); *see also United States v. Thompson*, 528 F.3d 110, 121 (2d Cir. 2008) ("[The defendant] points to no evidence that the substitution [of a juror] created bias or prejudiced his defense."); *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995) ("[W]e will not overturn a conviction for a Rule 24(c) violation unless appellant can show prejudice."). And Mr. Gordon offers no allegation, much less any evidence, that the resulting juror pool was tainted or otherwise adversely affected. *See United States v. Bradley*, 644 F.3d 1213, 1282 (11th Cir. 2011) ("Conjecture about the impact the replacement of a juror had on the jury's verdicts is . . . insufficient evidence of prejudice."). For these reasons, we reject his claim related to the district court's dismissal of the juror.

## E.    Speedy Trial Act

Mr. Gordon contends that certain provisions of the Speedy Trial Act, 18

U.S.C. §§ 3161–3174, were violated when the district court continued the date for

commencement of the trial—after the unsealing of the indictment on February 10,

2009—to January 19, 2010, and then subsequently to April 5, 2010.   He claims

that the district court "failed to articulate the information necessary to justify . . .

[the] continuances."  Aplt. Opening Br. at 49.

As alluded to in Part I, *supra*, on February 26, 2009, the government filed

an unopposed motion to declare the case complex pursuant to the provisions of 18

U.S.C. § 3161(h), in light of the massive pending discovery and complex legal

issues presented.  The district court granted the motion, declared the case

"complex," and concluded that the "ends of justice" outweighed the public's

interest in a speedy trial.  A few days later, the district court set the trial date for

January 19, 2010, and reiterated that, under 18 U.S.C. § 3161(h)(8)(A), the "ends

of justice would be served by granting [the] continuance."[31]  R., Vol. I, at 141

---

[31]     The district court referred to provisions concerning ends-of-justice continuances that were applicable before 2008.  *See* R., Vol. I, at 118 (Order Granting Unopposed Mot. of United States to Declare This Case a Complex Matter, filed Mar. 10, 2009) (citing 18 U.S.C. §§ 3161(h)(8)(A) and 3161(h)(8)(B)(ii) (2006)).  However, in 2008, "Congress redesignated 18 U.S.C. § 3161(h)(8) as 18 U.S.C. § 3161(h)(7)." *United States v. Hernandez-Mejia*, 406 F. App'x 330, 331 n.2 (10th Cir. 2011); *see* Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 13, 122 Stat. 4291, 4294 (2008).  We refer to the current numbering of the applicable provisions of

(continued...)

(Notice of Electronic Filing, dated Mar. 17, 2009).

After the case was reassigned to another district court judge (i.e., Judge Payne), he struck the pretrial conference and January 19th trial date. On March 17, 2010, Mr. Gordon filed a motion to dismiss under the Speedy Trial Act, arguing that the continuances in the case were inadequately explained and were not supported by a basis for exclusion under the Act. The court denied this motion, and the trial began on April 5, 2010.

"The Speedy Trial Act . . . requires that a criminal defendant's trial commence within 70 days after he is charged or makes an initial appearance, whichever is later . . . ."[32] *Bloate v. United States*, 130 S. Ct. 1345, 1349 (2010); *accord United States v. Larson*, 627 F.3d 1198, 1203 (10th Cir. 2010). The Act excludes "certain enumerated events" from this time period. *See Bloate*, 130 S. Ct. at 1349 (discussing 18 U.S.C. § 3161(h)(1)). Among those events are "proceedings concerning the defendant," 18 U.S.C. § 3161(h)(1), and time which

---

[31](...continued)
§ 3161(h), in addressing Mr. Gordon's arguments.

[32]  The parties agree that the seventy-day clock under the Act commenced on the day the indictment was unsealed. *See* 18 U.S.C. § 3161(c)(1) (noting "the trial of a defendant charged in an information or indictment . . . shall commence within seventy days from the filing date (and making public) of the information or indictment"). That is, there is no argument that Mr. Gordon's charges were made "public" before February 10, 2009, or that the speedy-trial clock should have begun at an earlier date for any other reason. We are content to proceed based upon the parties' agreement on this matter.

the court determines—"either orally or in writing"—should be excluded because "the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial," *id.* § 3161(h)(7)(A). As relevant here, the factors to be considered in granting a continuance under § 3161(h)(7)(A) include "[w]hether the case is so unusual or so complex . . . that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act]." *Id.* § 3161(h)(7)(B)(ii).

We review the district court's decision to grant a continuance for the "ends of justice" for an abuse of discretion. *See United States v. Toombs*, 574 F.3d 1262, 1268 (10th Cir. 2009) ("We apply an abuse of discretion standard to a district court's decision to grant an ends-of-justice continuance . . . ." (quoting *United States v. Gonzales*, 137 F.3d 1431, 1433 (10th Cir. 1998)) (internal quotation marks omitted)). "This court [otherwise] reviews de novo . . . the district court's compliance with the legal requirements of the Speedy Trial Act." *Id.*

In this case, the district court's original order granting the government's request for a continuance noted the voluminous discovery in the case, including documents detailing the hundreds of financial transactions that formed the basis for the charges. Further, the government's motion set forth in detail the hundreds

of thousands of documents that needed to be catalogued and separated, so that the parties could "identify[]" the relevant ones. R., Vol. I, at 105 (Unopposed Mot. of United States to Declare this Case a Complex Matter, filed Feb. 26, 2009). We conclude that the district court's findings were sufficient to justify the ends-of-justice continuance up to January 19, 2010, because it is obvious "what factors [it] relied upon in making its determination." *Larson*, 627 F.3d at 1206; *cf. id.* (concluding that the ends-of-justice continuance was inadequate where the district court did not make clear the factors it relied upon in making its determination).

Indeed, the record is clear that the district court's decision was based on the fact that the transactional evidence was extensive and complex, and that it would take additional time to sufficiently analyze and organize the evidence before trial. These facts were identified both in the court's order, *see, e.g.*, R., Vol. I, at 118 ("In this case, the number of defendants, the voluminous discovery [previously referenced in the order] and the ongoing nature of the investigation render the matter so complex as to warrant the grant of an ends-of-justice continuance . . . ."), and by reference to the government's motion, *see, e.g.*, *id.* at 104–05; *cf. Toombs*, 574 F.3d at 1271 ("[T]he district court need not articulate facts that are obvious and set forth in the motion to continue in granting an ends-of-justice continuance.").

While we have previously held that "[s]imply identifying an event, and

adding the conclusory statement that the event requires more time for counsel to prepare, is not enough," *Toombs*, 574 F.3d at 1271–72, the district court's findings here explained "why the mere occurrence of the event identified . . . necessitat[ed] the continuance," *id.* at 1271, and it is "clear from the record that the trial court struck the proper balance [under the Speedy Trial Act] when it granted the continuance,"[33] *Larson*, 627 F.3d at 1206 (quoting *United States v. Williams*, 511 F.3d 1044, 1056 (10th Cir. 2007)) (internal quotation marks omitted); *see United States v. O'Connor*, 656 F.3d 630, 639–40 (7th Cir. 2011) (reading an ends-of-justice continuance "in light of" earlier court orders, and concluding that the continuance was justified due in part to "the complexity of the case[ and] the magnitude of the discovery"); *United States v. Bieganowski*, 313 F.3d 264, 282 n.15 (5th Cir. 2002) (collecting cases and noting that "the decision

---

[33]     Further, the amount of time given by the continuance is particularly reasonable when considering Mr. Gordon's counsel's own position in early 2009 on the pace of the proceedings and the complexity of the case. In this regard, shortly after the district court filed its order granting the continuance, the government filed a status report and a motion for a scheduling conference, proposing a trial date of August 17, 2009. Mr. Gordon's counsel promptly filed a responsive memorandum complaining that the case had advanced too quickly, and that counsel would only be amenable to a trial date commencing *at the earliest* in mid-October of 2009. The record here demonstrates that the length of the continuance permitted by the district court is clearly rooted in counsel's averments to the court, and the expectation of the time it would take to "properly analyze the . . . transactions which [had to] be carefully pieced together" in order to present a "proper[] defen[se]." R., Vol. I, at 139 (David Gordon's Mem. in Resp. to Government's Status Report, filed Mar. 16, 2009). Mr. Gordon has offered no persuasive argument to the contrary.

to grant a continuance based on the volume of discovery[ is] consistent with cases interpreting section 3161(h)([7])"); *cf. United States v. Napadow*, 596 F.3d 398, 405–06 (7th Cir. 2010) ("While, of course, the record would have been more clear if the district court had identified precisely why the ends of justice served by granting the exclusion outweighed the best interest of the public and [the defendant] in a speedy trial, a comparison of the district court's actual statements with the circumstances of the pretrial proceedings provide an adequate basis to justify the . . . exclusion.").

Finally, from the record, it appears that much of the time between January 19, and April 5, 2010, was excludable under the Act because of pending motions and due to Mr. Gordon's filing of an interlocutory appeal. As a threshold matter, Mr. Gordon has short-changed this portion of the analysis. Notably, he broadly claims in a conclusory and unsupported fashion that a total of 240 days passed "when no motions had been filed and no adequate justification had been given for the . . . delay." Aplt. Opening Br. at 49. But he does not adequately identify whether this argument relates to any of the allegedly non-excludable days between January 19, and April 5, 2010, or only the period before that. Because it is not clear whether Mr. Gordon is specifically challenging the time period *after* January 19—*viz.*, the time *after* the first ends-of-justice continuance ended—we would be well within our discretion to reject any of his nonspecific, unsupported assertions when considering this period. *See Burrell*, 603 F.3d at 835.

In any event, even were we to focus on the period from January 19 to April 5, 2010, Mr. Gordon would not be entitled to relief. The Act excludes periods of delay "resulting from any interlocutory appeal," 18 U.S.C. § 3161(h)(1)(C); *accord* 3B Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure* § 835, at 434, 436 & n.17 (4th ed. 2013), and those "resulting . . . from the filing of [any pre-trial] motion through the conclusion of the hearing on, or other prompt disposition of, such motion," 18 U.S.C. § 3161(h)(1)(D); *see also United States v. Tinklenberg*, 131 S. Ct. 2007, 2012 (2011) (noting that the provision in § 3161(h)(1) regarding pre-trial motions applies "irrespective of whether the motion has any impact on when the trial begins"). Even if the appropriate calculations are completed for this period, according to the government's account of the litigation—which Mr. Gordon does not challenge—the total non-excludable time falls far short of the seventy-day limit. Put another way, when the total number of elapsed days between the unsealing of the indictment and the start of the trial is reduced by the total number of statutorily excludable days, the product (i.e., the difference) of non-excludable days is considerably less than the seventy days that the Act permits to run.[34]

---

[34] We note that the circuits are not uniform in their calculation of excludable days with respect to pre-trial motions; more specifically, the variance relates to whether to deem the filing or disposition date of motions excludable time. *See Williams*, 511 F.3d at 1051 n.5 (collecting cases and noting the lack of uniformity regarding this pre-trial motion calculation under then § 3161(h)(1)(F)).

(continued...)

For the foregoing reasons, Mr. Gordon has not shown a violation of the Speedy Trial Act.

## F.  Sentencing

Mr. Gordon lodges numerous challenges to his sentence, specifically relating to the district court's loss and gain calculations and its imposition of joint and several liability for the illicit stock sales.  Broadly, Mr. Gordon appears to make two, separate procedural challenges to his sentence.  First, he contends that the district court inappropriately based its measure of harm in this case "exclusively on the differences in the cost of the four stocks purchased by a group of persons oftentimes loosely linked to [him] and the amount each of those various parties sold their stock for," Aplt. Opening Br. at 51, and failed to take into consideration "other economic factors unrelated to the defendant's fraudulent activity that may have caused the stock to increase or decrease," *id.* at 52.[35]  This,

---

[34](...continued)
Apparently, "we have not directly addressed the issue."  *Id.*  However, regardless of how the excludable time is calculated—*viz.*, by *including* the date the motion is filed and its disposition date, or by *excluding* either or both dates—our ultimate conclusion would remain the same.  Mr. Gordon was tried within the seventy (non-excludable) days that the Act permitted.

[35]      The government has filed a motion to supplement the record under seal with multiple sentencing documents not included in the parties' appellate appendices.  Among these documents are earlier, provisional versions of Mr. Gordon's PSR and the district court's Statement of Reasons for imposing sentence.  Mr. Gordon objects to the inclusion of the provisional PSRs without the attachment of e-mails sent between his counsel and the U.S. Probation Office.

(continued...)

-74-

he reasons, was "procedural error" in the determination of his sentence, insofar as it concerns the application of the twenty-two-level enhancement under § 2B1.1(b)(1). *Id.* at 50. Second, he contends that the "damage[s] calculation should be individual, rather than joint" in cases like his, where the court attributed stock sales made by others who were at best only "tenuously affiliated" with him. *Id.* at 54. And, in the latter respect, he takes issue with the district court's attribution of others' illicit "gain" to him for purposes of "relevant conduct" under the Guidelines.

"[S]entences are reviewed 'under an abuse of discretion standard for procedural and substantive reasonableness.'" *United States v. Snow*, 663 F.3d 1156, 1160 (10th Cir. 2011) (quoting *United States v. Washington* (*Wildor Washington*), 634 F.3d 1180, 1184 (10th Cir. 2011)). "[W]e review the district court's legal conclusions *de novo* and its factual conclusions for clear error." *Gallant*, 537 F.3d at 1234. "A sentence is procedurally unreasonable if the district court incorrectly calculates or fails to calculate the Guidelines sentence, treats the Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, relies on clearly erroneous facts, or inadequately explains the sentence."

_____

[35](...continued)
He does not, however, object to the inclusion of the district court's Statement of Reasons. We **grant** the motion with respect to the Statement of Reasons, but because the PSR relied upon by the district court is already a part of the record, we see no need to consider earlier, provisional versions of it. Consequently, we **deny** the government's motion to consider such versions of the PSR.

*United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008); *see United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008) ("Procedural review asks whether the sentencing court committed any error in calculating or explaining the sentence.").

    **1.**      ***Section 2B1.1(b)(1)***

Section 2B1.1(b) "increases a defendant's base offense level for fraud according to the amount of the loss." *Wildor Washington*, 634 F.3d at 1184. For purposes of this provision, the court must "use the greater of actual or intended loss." *Id.* However, "[i]f the loss is not reasonably determinable, then a court must use the gain that resulted from the fraud as an alternative measure." *Id.* "When a defendant challenges the procedural reasonableness of [his] sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud is clearly erroneous." *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010). In other words, "we may disturb the district court's loss determination—and consequent Guidelines enhancement—'only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1263 (10th Cir. 2008)). However, the district court's "loss calculation methodology" is reviewed de novo. *Snow*,

663 F.3d at 1160 (quoting *Wildor Washington*, 634 F.3d at 1184) (internal quotation marks omitted).

In this case, the district court determined that it would be too difficult to determine the actual losses suffered by each individual investor affected by the conspirators' manipulation scheme. Thus, consistent with § 2B1.1, comment note 3(B), of the Guidelines, it calculated an alternative measure of illicit *gain*. *See* U.S.S.G. § 2B1.1, cmt. n.3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). In doing so, however, it first attempted (for comparative purposes) to make reasonable *estimates* of the total losses to investors, given the information available.

In calculating the loss estimates, the court utilized two separate methods. First, it subtracted the average price of each stock after disclosure of the fraud from the stock's average price during the promotional period. Then, it multiplied by the total number of shares sold. This method yielded a loss estimate of $55,150,000. Alternatively, the court subtracted the inherent value of the stocks from their average value during the promotional period, yielding a loss estimate of $47,240,000.[36]

_____

[36]     In *United States v. Nacchio*, 573 F.3d 1062, 1075 (10th Cir. 2009), we described "a stock's inherent value" as "the market's assessment of the stock's value, reflecting primarily the value of the firm's net assets and operations and its
(continued...)

The court then went on to calculate the total conspiratorial gain from the manipulation of National Storm, Deep Rock, and Global Beverage to be $43,927,809.95, and Mr. Gordon's gain attributable to sales of IPG to be $2,714,504,[37] and determined that those calculations corresponded to the loss estimates, *see Snow*, 663 F.3d at 1161 ("The defendant's gain may be used only as an alternate estimate of . . . loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." (quoting *Wildor Washington*, 634 F.3d at 1184)) (internal quotation marks omitted)). We have endorsed the base approach utilized by the district court in analogous contexts—*viz.*, using gain as an alternative measure of loss where loss cannot be reliably ascertained, provided that the court first makes a reasonable *estimate* of loss. *See United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007) ("[B]efore using gain as an alternate estimate of loss, the district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss."); *cf.*

---

[36](...continued)
potential earnings and growth prospects." This would be the value that a stock holds without reference to any fraudulent conduct of the defendant.

[37]    The conduct concerning IPG was not a part of the government's general conspiracy allegations, so the court simply added the proceeds realized from the fraudulent sale of IPG stock to the gains computed for National Storm, Deep Rock, and Global Beverage under the Guidelines grouping rules in § 3D1.3. Mr. Gordon's sentencing challenges on appeal deal primarily with the gain computations relating to the latter stocks, not IPG's.

*Gallant*, 537 F.3d at 1236–38 (holding that the district court improperly failed to calculate reasonable estimates of loss in arriving at an alternative gain figure in a financial-fraud scheme).

Mr. Gordon does not necessarily challenge the court's findings under the foregoing methodology; rather, he contends that the court should have *also* considered other potential causes of fluctuations in the applicable share prices of National Storm, Deep Rock and Global Beverage—for instance, the rising price of gas during the promotional period, the natural disasters that occurred during the holding period, etc.—and because the testimony that the district court relied upon did not necessarily take those factors into account, the resulting gain figures were erroneously obtained. In essence, Mr. Gordon challenges the inputs utilized by the district court, reasoning that the court failed to consider the "economic reality" of his conduct as required by our decision in *Nacchio*.[38]

---

[38] Although it might logically seem appropriate to apply *Nacchio*'s sentencing paradigm in the pump-and-dump context, it does not appear to be settled in our circuit whether *Nacchio* applies outside of the insider trading context. *See* 573 F.3d at 1086 (noting that "district courts must undertake 'thorough analyses grounded in economic reality,' when sentencing defendants *in insider trading cases*" (emphasis added) (citation omitted) (quoting *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005))). While other courts have applied *Nacchio*-type inquiries in the pump-and-dump context, *see United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007), Mr. Gordon has pointed to no Tenth Circuit case extending it to that context. However, given that we conclude that Mr. Gordon's *Nacchio* argument is unavailing, we may assume without definitively deciding that *Nacchio*'s sentencing principles apply with full force in the pump-and-dump context.

In *Nacchio*, we held that, when calculating a gain amount under the Guidelines in insider trading cases, the district court should utilize "[a]n approach that focuses on arriving at a figure that approximates the gain specifically resulting from [the] offense," which necessitates an inquiry into "the myriad of factors *unrelated to [the] criminal fraud* that could have contributed to the increase in the value of the securities." 573 F.3d at 1074 (emphasis added). More specifically, we held that "district courts must undertake 'thorough analyses grounded in economic reality.'" *Id.* at 1086 (quoting *Olis*, 429 F.3d at 547). Here, in arriving at its conclusions, the district court explicitly cited *Nacchio*, and stated that it was in fact considering the "economic reality" of the transactions at issue in its underlying analysis. *See* R., Vol. VIII, at 2795 (applying "[m]ultiple methods of calculating loss . . . [which we]re rooted in 'economic reality'"). Mr. Gordon concedes as much. *See* Aplt. Reply Br. at 28 ("Appellant acknowledges the district court stated at sentencing [that] it had considered this court's sentencing factors for a securities fraud case in [*Nacchio*].").

To be sure, the district court did not explain how any of the extraneous factors that Mr. Gordon identifies *on appeal* affected the stock sales of National Storm, Deep Rock, and Global Beverage.[39]  However, by its plain dictate,

_____

[39]     We are doubtful that Mr. Gordon presented this argument before the district court in the context in which he now raises it on appeal.  That is, he appears not to have argued that the district court should have, in its ultimate

(continued...)

*Nacchio* does not require the court to employ an empirical inquiry that takes account of the effect of every conceivable variable that could possibly affect a defendant's gain from an illicit stock sale. Rather, it requires the court to "adopt a sentencing approach that is focused on a defendant's criminally culpable conduct and has the effect of excising . . . unrelated market forces from the sentencing calculus, thereby narrowing the zone of unpredictability in sentencing." *Nacchio*, 573 F.3d at 1082. Yet this "excisi[on]" need not be absolutely "complete[]." *Id.*; *see also* U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a *reasonable estimate* of the loss." (emphasis added)). It must only ensure, *as an overarching matter*, that a defendant's punishment "reflects his . . . culpability for the criminal offense (rather than for unrelated gyrations of the market)." *Nacchio*, 573 F.3d at 1077. What was contemplated in *Nacchio* was not the complete elimination of "chance market forces" from a gain calculation, but merely the "minimiz[ation of] the influence of factors other than a defendant's unlawful acts on the calculation of punishment." *Id.* at 1086 n.23.

Significantly, in *Nacchio*, we suggested that unrelated market events were

_____

[39](...continued)
calculations, considered *specifically identified* non-fraud related factors in applying the enhancement under § 2B1.1(b)(1)(L). However, the government does not contend that Mr. Gordon failed to preserve this issue (that is, that Mr. Gordon forfeited it). Therefore, we exercise our discretion under the particular circumstances presented here to ignore the possible lack of preservation.

material only insofar as they "c[ould] be identified" and assessed. *See id.* In this regard, it is notable that Mr. Gordon has not suggested that the district court actually had evidence in the record to identify, and consider the effects of, the alternative variables that he advocates for here. In fact, in his formal objections to the PSR, Mr. Gordon "agree[d] that there is insufficient evidence in the record to separate out the impact of legitimate market factors on the price of each stock and quantify the impact of the promotional schemes." R., Vol. VI, at 623 n.7 (Letter from Thomas O. Gorman to Scott Kallenberger, dated Aug. 2, 2010) (setting out Mr. Gordon's formal objections to the PSR). Thus, we would be hard-pressed to conclude that the district court committed reversible error in not identifying, and assessing the impact of extrinsic variables, when there was no foundation in the record for it to do so.[40]

---

[40] Mr. Gordon does not contend that filling such purported evidentiary holes was the government's burden and that, consequently, any deficiencies in the district court's ruling must be laid at the government's feat. Indeed, Mr. Gordon tacitly suggests that he bore at least a portion of the burden to come forward with evidence regarding such non-fraud factors. In this regard, he complains that he might have filled any purported evidentiary holes, if the court had allowed him access to substitute assets; with them, he allegedly could have hired an economic expert to fill the holes. Although the question of burden of proof regarding the identification of extrinsic, non-fraud factors does not appear to have been explicitly addressed in *Nacchio*, the authorities upon which its analysis is founded seem to have placed this burden on the defendant. *See Nacchio*, 573 F.3d at 1085 (relying, *inter alia*, on *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)). Because of Mr. Gordon's silence on the issue, however, we need not resolve the matter in this case. Furthermore, even if Mr. Gordon's experts could have filled the purported holes in the record, for reasons explicated below, we

(continued...)

In any event, even if the district court committed some error, as the government argues, it would be harmless. *See* Aplee. Br. at 64 ("In any event, the loss calculation did not affect Gordon's sentence."). Although Mr. Gordon points to some factors that the district court conceivably could have considered, he does not explain how those factors would have materially affected the district court's sentencing calculations. In this vein, the district court found that the government had made an adequate showing of the conspiratorial gain amount by virtue of its trial evidence. Mr. Gordon has not identified *how* the court's calculations would have been changed, or how any variable would have necessarily lowered the total gain calculation to an amount that is *less than* $20,000,000—i.e., the trigger under § 2B1.1(b)(1)(L) for the twenty-two-level enhancement that the district court ultimately applied. And, on the basis of this record, we cannot discern any support for such a proposition. Furthermore, as the government suggests, the district court "made clear that its sentence was not driven by the loss calculation and corresponding Guidelines range," *id.*, given that it expressed dissatisfaction with the severity of the Guidelines in securities fraud cases and granted Mr. Gordon a very substantial downward variance, *see* R., Vol. VIII, at 2824–25 (finding that "a downward variance . . . provides for an appropriate sentence" and

---

[40](...continued)
cannot conclude that the district court's sentencing computations would have been materially altered.

-83-

noting that ranges specified by the securities fraud Guidelines "are patently absurd on their face."). Mr. Gordon has not alleged that the district court would have varied downward even further, but for any alleged error in computing his Guidelines range. In sum, we conclude that Mr. Gordon's sentencing challenge must fail: we discern no error in the district court's Guidelines gain computations and, even if it did err, such error was harmless.

## 2. *Joint Liability and Relevant Conduct*

Mr. Gordon also contends that the district court should have held him responsible at most for his own trading profits, and not the profits linked to other alleged co-conspirators. In that respect, he argues that "this is a good case for the court to find that the damage calculation should be individual, rather than joint." Aplt. Opening Br. at 54.

Our review of the record demonstrates that Mr. Gordon did raise a version of this argument below, though he certainly has not helped himself in his cursory treatment of the issue on appeal. In any event, we may easily dispose of Mr. Gordon's challenge to the district court's decision to attribute to him the gains of alleged co-conspirators in determining his offense level under § 2B1.1. "U.S.S.G. § 1B1.3(a)(1)(B) provides that a defendant involved in a joint criminal undertaking may be held responsible for relevant conduct that includes *all reasonably foreseeable* conduct of his co-conspirators that is in furtherance of the

conspiracy." *United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011); *see*

*United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010) ("Where the

amount of loss is the result of 'jointly undertaken criminal activity'—such as a

conspiracy—the relevant amount of loss must be determined on the basis of 'all

reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity, that occurred during the commission of the offense

of conviction.'" (quoting U.S.S.G. § 1B1.3(a)(1)(B))); *see also United States v.*

*Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009) ("In calculating loss under the

Guidelines, the district court does not limit itself to conduct underlying the

offense of conviction, but rather may consider all of the defendant's 'relevant

conduct' [under § 1B1.3]." (quoting U.S.S.G. § 1B1.3)).

Application Note 3(B) to § 2B1.1 states that the court "shall use the gain

that resulted from the offense" where loss cannot be calculated, U.S.S.G. § 2B1.1

cmt. n.3(B)—as, of course, the district court in this case did. "The use of the

word 'offense' when applied here refers to the *conspiracy*." *Offill*, 666 F.3d at

180. As long as the gain of a co-conspirator is reasonably foreseeable, it can be

attributed to a defendant. *See id.* (citing cases).

Thus, to the extent that Mr. Gordon contests *as a matter of law* the district

court's use of a joint calculation in computing his gain, his argument lacks merit.

Indeed, courts have consistently held that reasonably foreseeable gains

attributable to co-conspirators' acts are properly tabulated in § 2B1.1(b)(1)'s offense-conduct computations. *See, e.g.*, *id.* (collecting cases and holding that the district court did not err in imputing co-conspirators' gains to a defendant in a pump-and-dump scheme in calculating his offense level under § 2B1.1(b)(1)). And the record here demonstrates that the district court had an adequate factual basis on which to attribute all of the relevant conspiratorial conduct at issue to Mr. Gordon for sentencing purposes.[41] *See United States v. Lewis* (*Charles Lewis*), 594 F.3d 1270, 1290 (10th Cir. 2010) (concluding that a co-conspirator's fraudulent conduct was financial in nature and was therefore reasonably foreseeable to the defendant as part of a ponzi scheme, where the defendant played an extensive role in the scheme); *see also United States v. Sells*, 541 F.3d

---

[41] Mr. Gordon also challenges, in passing, that the "list of 'associates' compiled by Agent [Jarom] Gregory to inflate the overall damage calculation" was improperly applied to him because it included individuals like Robert Garner—the president of Deep Rock—who did "nothing more than work in the same office building with [Mr. Gordon]." Aplt. Opening Br. at 54. His briefing on this issue is woefully inadequate. While he singles out Mr. Garner in illustration, and makes a vague and generalized reference to "several others like him who had been tenuously affiliated" with Mr. Gordon, *id.*, he does not begin to describe the factual or legal bases for a conclusion that it was error to take into account any of the individuals (including Mr. Garner) for purposes of calculating relevant conduct. In essence, this argument is conclusory and offers no proper foundation for appellate review. Therefore, we will not examine it further. *See, e.g.*, *United States v. Pursley*, 577 F.3d 1204, 1228 (10th Cir. 2009) ("[The defendant] does not cite a single case to support his position. Consequently, we are free to end our inquiry by applying the principle that '[a]rguments inadequately briefed in the opening brief are waived.'" (second alteration in original) (quoting *Adler*, 144 F.3d at 679)).

1227, 1235 (10th Cir. 2008); *United States v. Osborne*, 332 F.3d 1307, 1311 (10th Cir. 2003); *United States v. Tagore*, 158 F.3d 1124, 1128–30 (10th Cir. 1998); *United States v. McFarlane*, 933 F.2d 898, 899 (10th Cir. 1991). For these reasons, we reject Mr. Gordon's joint-and-several argument.

## G.    Final Order of Forfeiture

Mr. Gordon lastly argues that the district court failed to follow the dictates of 21 U.S.C. § 853(p) in issuing a final forfeiture order. "[W]e review the district court's forfeiture order as we would any other sentencing determination—that is, we review its legal conclusions de novo and its factual findings for clear error." *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012); *see Libretti v. United States*, 516 U.S. 29, 38–39 (1995) ("Forfeiture is an element of the sentence imposed following conviction . . . ." (emphasis omitted)). "A forfeiture judgment must be supported by a preponderance of the evidence." *Bader*, 678 F.3d at 893.

On January 11, 2011, upon the government's motion, the district court ordered the forfeiture of various interests Mr. Gordon held in real property and financial instruments as "substitute property" pursuant to Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853(p).[42] The order was entered subsequent to the district court's entry of a joint and several money judgment in the amount of $2,747,761.81, individually against Mr. Gordon for the IPG wire

---

[42]    These included shares of various companies, the "Delvest" lots, and other accounts.

fraud scheme, and $43,927,809.95 representing proceeds traceable to the criminal acts at issue.

Rule 32.2(e)(1)(B) authorizes the government to move for an order of forfeiture, or to "amend an existing order," to include property that "is substitute property that qualifies for forfeiture under an applicable statute." As relevant here, the criminal forfeiture statute provides that a defendant's substitute property may be forfeited where,

> as a result of an act or omission of the defendant [the forfeited property]-- (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p)(1)(A)–(E). Forfeiture "shall" be ordered "up to the value of any property described." *Id.* § 853(p)(2).

In support of its second motion for forfeiture, the government offered the affidavit of Litigation Financial Analyst William Robert Taylor, who averred that he had conducted a full financial investigation of Mr. Gordon's business and personal accounts. Section 853(p)(1), by its express terms, permits the forfeiture of substitute assets, when directly traceable assets cannot be located despite the exercise of due diligence, because of an act or omission of the defendant. *See, e.g.*, *Bornfield*, 145 F.3d at 1139 ("The substitute assets provision allows the

-88-

forfeiture of other assets not already forfeitable when the forfeitable asset is unavailable due to some act or omission of the defendant."). Mr. Taylor specifically averred that "[d]ue to acts or omissions of [Mr. Gordon], additional property directly traceable to the conspiracy . . . is unavailable for forfeiture." R., Vol. VI, at 1101 (Aff. of William Robert Taylor, signed Nov. 19, 2010). Similarly, the affidavit set forth that law enforcement personnel "have been unable to locate, through the exercise of due diligence, any other assets . . . that are traceable to the offenses." *Id.* at 1101–02.

Because the directly forfeitable "assets" previously identified consisted largely of a now uncontested money judgment, and the money could not be found in Mr. Gordon's accounts, it was reasonable for Mr. Taylor to infer, and the district court to find, that the money was dissipated due to Mr. Gordon's conduct. Indeed, given the transactional nature of a large-scale securities fraud conspiracy, vast sums of money are easily transferred or hidden. The evidence in this case demonstrated that, as part of the conspiratorial plan, funds used to purchase stocks were frequently decentralized and concealed.

"The Government generally has little difficulty in making the necessary showing [under § 853(p)]." Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 22-3, at 643 (2007) (collecting cases); *see United States v. Garza*, 407 F. App'x 322, 324–25 (10th Cir. 2011) (relying on language asserting that the

government exercised due diligence in attempting to located forfeitable assets under § 853(a) in concluding that the government met its burden of establishing the requirements of § 853(p)); *see also United States v. Alamoudi*, 452 F.3d 310, 316 (4th Cir. 2006) (concluding that the affidavit was sufficient to support forfeiture under § 853(p) where it contained information that, based on the investigator's experience, the "acts" or "omissions" of the defendant made the proceeds unavailable); *United States v. Candelaria-Silva*, 166 F.3d 19, 42–43 (1st Cir. 1999) (holding that the government complied with § 853(p)'s requirements where it submitted an affidavit that "recited the efforts [it] had made to locate the proceeds of the . . . conspiracy" and concluded that the defendant had disposed of those proceeds); *United States v. Faulk*, 340 F. Supp. 2d 1312, 1315 (M.D. Ala. 2004) (finding that the government met its burden under § 853(p)(1) where it "show[ed] that . . . laundered money ha[d] been substantially dissipated due to the dispersion of funds by the defendants themselves"); *cf. United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011) (holding that there was no evidence that forfeitable property was made unavailable by an act of the defendant, because it was in the government's possession). Here, despite posing general, rhetorical questions in attempting to construct an argument, *see, e.g.*, Aplt. Opening Br. at 56 ("Had Appellee knocked on Tommy Gambino's door to ask him if he still had any of the illicit proceeds attributable to him?"), Mr. Gordon offers no reasonable basis to dispute or otherwise contradict the averments in Mr. Taylor's affidavit

that the government exercised due diligence in seeking to locate the directly forfeitable funds at issue and that they were missing due to an act or omission of Mr. Gordon.

Mr. Gordon further contends that the district court erred in finding in its preliminary orders of forfeiture that the government had satisfied the requirements of § 853(p)(2), which, upon a proper showing under § 853(p)(1), requires the court to "order the forfeiture of any other property of the defendant." Mr. Gordon complains that the government simply did not show that (1) his personal "residence" *belonged* to him (i.e., because it was in his wife's name) and (2) that many of the other identified assets belonged to him.

Contrary to Mr. Gordon's suggestions, the Gordon residence was not ordered forfeited entirely as "substitute property." Rather, the court found $1,702,000 of equity in the home directly forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Mr. Gordon's brief does not appear to challenge the propriety of this *direct* forfeiture. Mr. Gordon's other challenges are non-specific and conclusory, which *yet again* compels us to decline searching review. However, we note that third-party ownership disputes are generally "deferred to . . . ancillary proceeding[s] [under § 853(n)] and do not factor into the court's determination whether to order the forfeiture of the property in the first instance." Cassella, *supra*, § 22-3, at 645; *see* Fed. R. Crim. P. 32.2(c)(1);

*Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 462–63 (6th Cir. 2006) (en banc) (Clay, J., dissenting) (suggesting that a third party must assert his or her interest in property adjudicated to be forfeitable in ancillary proceedings). "At [the forfeiture] stage the court does not—and, indeed, may not—determine the rights of any third parties who assert an interest in the property. Third parties . . . have an opportunity to assert their rights to the property in an 'ancillary proceeding' . . . ."[43] *United States v. Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008) (citations omitted) (quoting Fed. R. Crim. P. 32.2(c)); *see United States v. Musson*, 802 F.2d 384, 386 (10th Cir. 1986) ("Appellants' concerns regarding potential third party interests in the subject property are also addressed by a provision for subsequent third party petitions to the court." (citing, *inter alia*, 21 U.S.C. § 853(n))); Cassella, *supra*, § 22-3, at 645–46 ("[T]he court does not determine that [a] substitute asset belongs to the defendant when it includes it in the preliminary order of forfeiture; rather, the requirement in § 853(p)(2) that the substitute asset be 'property of the defendant' is satisfied by allowing third parties to contest the forfeiture of the

---

[43] Indeed, in the district court's final order of forfeiture it is clear that an unidentified ancillary claimant "consented and stipulated to the entry of [the] final order" with regard to the Gordon residence. R., Vol. VI, at 1224 (Dist. Ct. Final Order of Forfeiture of Real Property & Funds in Financial Accounts, filed Feb. 16, 2011). The record thus demonstrates that ancillary proceedings were held, and Mr. Gordon has not explained the substance of any determination made in those proceedings, much less demonstrated error.

property in the ancillary proceeding pursuant to § 853(n) and Rule 32.2(c).").

Thus, we reject Mr. Gordon's arguments to the extent that they challenge the district court's preliminary forfeiture orders and their effect on third-party interests. In sum, we conclude that the government offered sufficient evidence to make the required showings under § 853(p)(1) and (p)(2) and that the district court did not err in issuing its orders of forfeiture.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Gordon's conviction and sentence, including the district court's orders of forfeiture.